FEDERAL TRADE COMMISSION,
Plaintiff,

v.

CARDINAL HEALTH, INC. and Bergen
Brunswig Corp., Defendants.

FEDERAL TRADE COMMISSION,
Plaintiff,

v.

McKESSON CORP. and Amerisource
Health Corp., Defendants.

Nos. CIV. A. 98–595, CIV. A. 98–596.

United States District Court,
District of Columbia.

July 31, 1998.

Michael E. Antalics, Federal Trade Commission, Washington, DC, for Federal Trade Commission.

Thomas Francis Cullen, Jr., Kevin David McDonald, Phillip Aaron Proger, Jones, Day, Reavis & Pogue, Washington, DC, Bernard W. Nussbaum, New York, NY, for Cardinal Health, Inc.

Steven A. Newborn, Rogers & Wells, Washington, DC, James B. Weidner, Roger & Wells, New York, NY, for Bergen Brunswig Corp.

Robert W. Doyle, Jr., Arent, Fox, Kintner, Plotkin & Kahn, Jonathan Mark Shaw, Wiley, Rein & Fielding, Frank S. Swain, Baker & Daniels, Washington, DC, for Bindley Western Drug Company, C.D. Smith Drug Company, Michael F. Ackerman.

William Bradford Reynolds, Collier, Shannon, Rill & Scott, P.L.L.C.; Frank James Eisenhart, Dechert, Price & Rhoads, Washington, DC, for McKession Corp.

Joseph Tate, Dechert, Price & Rhoads, Philadelphia, PA, Ezra D. Rosenberg, Dechert, Price & Rhoads, Princeton, NJ, for Amerisource Health Corp.

## MEMORANDUM OPINION

SPORKIN, District Judge.

The Plaintiff Federal Trade Commission ("FTC") seeks to enjoin the proposed mergers of Defendants Cardinal Health, Inc. ("Cardinal") with Bergen–Brunswig Corp. ("Bergen") and McKesson Corp. ("McKesson") with AmeriSource Health Corp. ("AmeriSource"). The Plaintiff moves for the injunction under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b) in order to stop the Defendant companies from merging before the FTC can hold a full administrative hearing on the whether the proposed transactions are in violation of Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45. From June 9, 1998 to July 17, 1998, this Court held an extensive evidentiary hearing in the matter. After careful consideration of all of the facts presented, this

Court grants Plaintiff's motion for the reasons set forth below.[1]

## I. BACKGROUND

### A. THE PARTIES

Plaintiff FTC is an administrative agency charged with the mission of enforcing the federal antitrust laws for the benefit of the American consumer. *See* Federal Trade Commission Act, 15 U.S.C. § 41 *et seq*. The Defendants are Fortune 500 corporations listed on the New York Stock Exchange whose principal business is the nationwide wholesale distribution of prescription drugs.[2] The four Defendants are the largest of the forty plus wholesale drug distributors in the United States.

Defendant McKesson is a Delaware corporation headquartered in San Francisco, California. In both size and sales, McKesson is the largest wholesale distributor of prescription drugs in the United States. It currently operates 35 pharmaceutical distribution centers, 33 of which are in the contiguous United States. In the fiscal year ending March 1998, McKesson posted revenues of 20.8 billion dollars, approximately 12 billion dollars coming from prescription drug distribution alone. For the 1998 fiscal year, its after-tax net income was 154.9 million dollars. *See* DXC 48 at 24. McKesson's profit margins are widening. Excluding nonrecurring charges, for the quarter ending December 31, 1997, McKesson reported an 80% increase in operating profits over the same quarter a year ago, while revenues increased 34%. Based on sales from the fourth quarter of 1997, 32% of McKesson's sales were to hospitals and other institutions, 37% to independent pharmacies, and 31% to retail chain pharmacies. *See* PX 461 at 11.

Defendant Bergen is a New Jersey corporation headquartered in Orange County, California. Bergen is the second largest wholesale distributor of prescription drugs in the United States. It currently operates 31

pharmaceutical distribution centers, as well as alternate site and depot facilities. For the fiscal year ending September 30, 1997, Bergen's net sales and other revenues were 11.6 billion dollars, with an after-tax net income of 81.6 million dollars. Bergen's 1997 net sales were 17% higher and after-tax earnings 20% higher than 1996. *See* PX 1205 II-2-3. To date, Bergen's 1998 revenues are approximately 12.5 billion dollars. Based upon 1995 data, 50% of Bergen's sales were to hospitals, 27% to independent drugstores, and 16% to chain pharmacies.

Defendant Cardinal is an Ohio corporation headquartered in Dublin, Ohio. Cardinal is the third largest wholesale distributor of prescription drugs in the United States. It currently operates 26 pharmaceutical distribution centers, four specialty distribution centers, one medical/surgical distribution facility, six packaging facilities, and four specialty centers. For the fiscal year ending June 30, 1998, its revenues were approximately 12.7 billion dollars, with pharmaceutical distribution accounting for approximately 11.5 billion dollars. For the 1997 fiscal year, Cardinal's revenues were 10.97 billion dollars and its after-tax net income 184.6 million dollars. *See* DXC 45 at 20, DXC 419 at 70. Of that 184.6 million dollars, Cardinal's after-tax net earnings on pharmaceuticals alone were 140 million dollars, the highest in the industry. Cardinal's net earnings for the first quarter of 1998 were 34% higher than for the first quarter of 1997, even though revenues grew only 20%. According to 1996 sales figures, 52% of Cardinal's sales were to hospital and other institutional customers, 16% to independent drug stores, 29% to nonwarehousing chain pharmacies, and 3% to self-warehousing chain pharmacies. *See* PX 1215 5(d).

Defendant AmeriSource is a Delaware corporation headquartered in Malvern, Pennsylvania. AmeriSource is the fourth largest wholesale distributor of prescription drugs in the United States. It currently operates 19 drug distribution centers and three specialty

---

1. This opinion shall constitute the Court's Findings of Facts and Conclusions of Law.

2. In addition to prescription drugs, Defendants also distribute related products such as over-the-

counter ("OTC") pharmaceuticals, health and beauty aids ("HBAs"), sundries, medical/surgical supplies, and home healthcare equipment.

products distribution facilities. For the fiscal year ending September 30, 1997, its revenues were 7.8 billion dollars, with an after-tax net income of 45.5 million dollars. *See* PX 1212 part II.6. Based on 1997 sales data, 47% of the company's total sales were to hospitals and managed care facilities, 33% to independent drug stores, and 20% to chain pharmacies. *See* PX 1212 at 1.

Over the last twenty years, there has both substantial growth and rapid consolidation in the wholesale industry. For the most part, the four Defendants have been the ones leading the trend. As a result of their acquisitions over the years, the four Defendants are the only wholesalers that are able to provide national coverage through a network of distribution centers across the entire United States.[3] Most recently, the four Defendants have also begun to integrate vertically by acquiring businesses related to the distribution of drugs and related health care products.

Founded in 1833, McKesson became the first national drug wholesaler. It achieved its nationwide scope during the Great Depression when it acquired many of the failing drug wholesalers. It remained the sole national drug wholesaler until 1992, when Bergen expanded its coverage to the entire nation. In 1988, McKesson attempted to acquire AmeriSource, then known as Alco Health Services Corp. ("Alco"), but abandoned its efforts after the FTC challenged the merger. In November 1996, McKesson successfully acquired the business and principal assets of the bankrupt FoxMeyer Corp. ("FoxMeyer"), which at the time of the purchase, was the fourth largest wholesale distributor of prescription drugs. Immediately after the purchase, McKesson had approximately 57 pharmaceutical distribution centers. In the following two years, it closed 15 and sold 3 of them. As of February 5, 1998, McKesson's plans included closing three more of the centers as a result of the Fox-Meyer merger.

Recently, McKesson began to integrate vertically by acquiring several businesses related to the distribution of pharmaceutical products and health care supplies: In December 1995, McKesson acquired BioServices Corporation, a business that provides product marketing and support services for the pharmaceutical industry; in April 1996, McKesson acquired Automated Healthcare, Inc., which specializes in automated pharmaceutical dispensing systems; and in February 1997, McKesson acquired General Medical, Inc., a multi-market distributor of medical/surgical supplies.

Bergen–Brunswig was created by the 1969 merger of Bergen, an East Coast company, and Brunswig Drug Co., a West Coast operation. Since 1978, Bergen expanded by acquiring eleven other drug wholesalers, including Durr Drug Company, Owens and Minor, South Bend Drug, and Dr. T.C. Smith. Bergen became the second national drug wholesaler in 1992 after it acquired Dirrfilauer in the southeastern part of the United States. Of the 38 drug distribution centers acquired by Bergen in the last fifteen years, 34 have been closed. In 1996, Bergen briefly explored the idea of vertical integration with a proposed acquisition of Ivax, which at the time was the largest generic drug manufacturer in the United States. The proposed transaction was abandoned shortly thereafter.

Cardinal was established in 1971 as a food wholesaling company that distributed food products to independent supermarkets. In 1979, Cardinal entered the drug wholesaling industry by purchasing Bailey Drug, an existing drug wholesaler. After going public in 1983, Cardinal continued to expand by acquisition: In 1984, it acquired Ellicott Drug; in 1986, Daly Drug and John L. Thompson; in 1988, Marmac Distributors; in 1990, Ohio Valley Drug; in 1991. Chapman Drug; in 1993, Solomons.; and in 1994, Baherns, and Humiston–Keeling.

Cardinal became a national drug wholesaler in 1994 when it acquired and merged with Whitmire Distribution Co., a California based drug wholesaler with 3 billion dollars in annual revenues and distribution centers locat-

---

**3.** Bindley Western, the next largest drug wholesaler with 4.35% of the wholesale market, is on the verge of becoming a national wholesaler.

ed throughout the western and central United States.

Aside from acquiring other drug wholesalers, Cardinal has also diversified by acquiring related businesses in the pharmaceutical industry. In May 1996, Cardinal acquired Pyxis Corp. ("Pyxis"), the pioneer manufacturer of automated vending machines which dispense pharmaceuticals and hospital supplies to the staff of medical institutions. To date, Pyxis has 51,000 systems installed in 1,600 hospitals throughout the United States and Canada. *See* PX 459 at 3. As part of the Pyxis merger, Cardinal also acquired Allied Pharmacy Service, Inc., one of the largest hospital pharmacy management companies in the United States. In November 1995, Cardinal acquired Medicine Shoppe International, Inc., the nation's largest franchiser of independent retail pharmacies with 1030 franchisees in the United States and an additional 142 in five foreign countries. *See* PX 459 at 3. In addition, Cardinal acquired Owen Healthcare, a hospital pharmacy management company, and PCI, a pharmaceutical packaging company. .

AmeriSource is the descendent of the Kauffman Company, founded in 1881. Kauffman was one of the pioneers in developing the hospital business for drug wholesalers. In 1977, Kauffman was sold to Alco Standard Co., the predecessor of AmeriSource. Before buying Kaufmann, Alco had primarily been in the fine paper business. With the acquisition of Kaufmann and The Drug House, a family run business in Philadelphia, Alco entered the drug distribution market. Since 1978, Alco continued to expand by acquiring seventeen drug wholesalers. After management bought the company in 1988, it changed the company's name to AmeriSource (1994), and in 1995, it took the company public. AmeriSource attained national status in 1996, the last of the four Defendants to do so. Most recently, it acquired Gulf Distribution in February 1996, and the Walker Drug Company in March 1997.

As the history of the four Defendants indicates, over the years, they have acquired other drug wholesale companies and consolidated operations to achieve greater economies of scale. While the size and scope of the four Defendants are significant, three of the Defendants attained their national status relatively recently—namely within the past six years.

## B. INDUSTRY OVERVIEW

In the United States, the pharmaceutical industry is one of the most dynamic and important segments of the national economy. Due to the advances in medical science, there are a staggering number of prescription drugs for nearly every kind of health condition. Prescription drugs have become an essential elemental of modern health care. In 1997 alone, 94 billion dollars worth of prescription drugs were dispensed in the United States. Today, an individual can fill a prescription almost immediately, for there is a pharmacy around the corner in nearly every neighborhood in the United States. Most pharmacies can fill a prescription on the spot, or at least guarantee next day delivery. The ease with which people can obtain their prescriptions requires an industry capable of delivering the needed drugs from the national manufacturers to the local dispensers. The dispensers of prescription drugs include the neighborhood independent pharmacies; chain pharmacies such as CVS, Rite–Aid, and Walgreens; hospitals; nursing homes; and alternate care sites.

The distribution and delivery of prescription drugs from the manufacturer to the dispenser is not an easy task. It involves not only the quick and efficient transportation of drugs on a daily basis, but also large facilities to keep a constant inventory of over 18,000 different brands of drugs in stock. Most of the retail outlets and institutions that dispense prescription drugs do not have the ability to store the large number and variety of drugs that they sell. In order to fill prescriptions on the spot each and every day, dispensers must be able to obtain the requested drugs on a continuous basis from the manufacturers as quickly as possible. Thus, the fast and efficient distribution of prescription drugs is a critical component of the pharmaceutical industry.

For the most part, the distribution end of the pharmaceutical industry consists of four

segments: (1) wholesalers; (2) manufacturer direct; (3) mail order; and (4) self warehousing by retailers.

1. *Wholesalers:* Wholesalers, such as Defendants, are the "middle-men" between manufacturers and dispensers. They provide an expeditious and cost-effective means for the purchase, delivery, and sale of prescription pharmaceuticals. In short, they purchase and obtain drugs from the manufacturers, store the drugs in anticipation of customer demand, and then sell and deliver the desired quantities to the individual dispenser. At present, there are 40–plus full-line pharmaceutical wholesalers in the United States; the four Defendants control close to 80% of this wholesale pharmaceutical distribution business.

2. *Manufacturer Direct:* When a manufacturer sells directly to the dispenser, the drugs are shipped straight from the manufacturer to the dispenser. This form of distribution, known as "manufacturer direct," completely bypasses the need for any intermediary distributor. In the past decade, institutional consumers of pharmaceutical drugs (hospitals and retail pharmacy chains), as well as independent retail pharmacies, have significantly decreased the percentage of pharmaceuticals purchased directly from the manufacturer in terms of the total dollar volume of drugs purchased. *See* Stipulation 2. During the same decade, mail order pharmacies have increased the amount and percentage of pharmaceuticals they purchase direct from manufacturers.

3. *Self-warehousing:* Self-warehousing occurs when retail or institutional dispensers take on the task of distribution themselves. Instead of relying upon an outside distributor, the retailer or health care institution buys direct from the manufacturer; stores the drugs in one or more of its own warehouses; and then delivers the drugs to its retail stores and hospitals as needed. In short, they act as their own wholesaler. Retail chain pharmacies are the only dispensers of pharmaceutical drugs that self-warehouse to any significant extent. As a group, in the last decade, retail chains with four or more stores (including drug stores, mass merchandisers, and food stores) have increased the amount and percentage of pharmaceuticals that they self-warehouse in terms of the total dollar volume of pharmaceuticals purchased from 60.9% to 66.1%. *See* Stipulation 1.

4. *Mail Order:* Individuals today can fill their prescription drugs by mail without going to a retail store or hospital. The dispensing of pharmaceuticals by mail order is the fastest growing segment of the industry. From 1990 to 1997, the sale of pharmaceuticals by mail order increased from 5.1% to 9.7% of the total sales. *See* Stipulation 3. Mail order pharmacies receive prescriptions by fax or through the mail and dispense the drugs directly to consumers anywhere in the United States. Mail order is often used to dispense "maintenance" drugs regularly used by patients over an extended period of time. Yet unlike other forms of distribution, mail order operations do not buy all of the prescription drugs they warehouse in inventory direct from the manufacturer. In fact, mail order companies often use the services of another distributor, most often a wholesaler, to buy their inventory. In that sense, mail order operations are a hybrid between the distribution and retail ends of the pharmaceutical industry.

Of the 94 billion dollars in prescription drugs dispensed in 1997, 55 billion dollars (58.5% of the total) was distributed by wholesalers including the four Defendants. The other 39 billion dollars (41.5% of the total) was distributed through the other three channels, principally by direct delivery from the manufacturer. *See* DXM 535. In the drug industry, distributors receive the smallest share of the gross profits: In 1997, for every dollar of prescription drugs sold, 76 cents went to the manufacturer, 20 cents to the dispenser, and only 4 cents to the wholesale distributor. *See* DXC 154C. Typically, a drug manufacturer establishes a wholesale list price, or "wholesaler acquisition cost" ("WAC"), for its prescription drugs. For brand-name, or "branded," prescription drugs on which they have an exclusive patent, the manufacturers set the WAC unilaterally or negotiate directly with the dispenser, in most instances leaving the wholesaler out

of the price setting aspect of the transaction.[4] For generic drugs typically, the WAC is negotiable between the manufacturer and the wholesaler. In 1997, branded pharmaceuticals accounted for approximately 90% of the dollar volume of pharmaceuticals dispensed in the United States. Generic drugs accounted for the remaining 10% or so.

Manufacturers often offer distributors discounts, such as cash rebates, for prompt payment and volume purchases. As a result of manufacturers' incentive, wholesalers can often acquire the drugs for prices less than the listed WAC. When retail dispensers purchase their prescription drugs from wholesalers, the price of the drugs is either the WAC or a base price negotiated between them and the manufacturer. In addition, the dispenser pays the wholesaler a certain percentage fee, or "upcharge," that has been negotiated for the cost of the distribution. At times, wholesalers sell drugs to dispensers for a price that appears to be at a loss. Valued customers can often buy drugs from wholesalers for the WAC *minus* a certain negotiated percent. The wholesaler still profits from these "cost minus" transactions by taking advantage of manufacturer rebates and discounts, which allow them to purchase the drugs for a cost below the WAC.

The revenues generated from the upcharge and other brokered fees are termed "sell-side margins." "Buy-side margins" result from the prompt and early payment discounts from manufacturers, earned rebates and discounts, and increases in the value of inventories as manufacturers' prices rise. Revenues are generated through the "float," or the time differential between when the wholesaler receives payment from the retail dispenser and when the payment to the manufacturer is due. In instances where the wholesaler gets paid by the dispenser before the wholesaler's payment is due to the manufacturer, the wholesaler, through the investment of the float, is able to earn additional income.

Traditionally, wholesalers bought the drugs from manufacturers, took ownership of the drugs in their own warehouses, and then in turn, resold them to the dispensers and delivered the goods direct to their individual stores and institutions. This traditional service is called "direct store delivery." In light the growing trend in the industry to self-warehouse, wholesalers have included in addition to this traditional delivery system "dock-to-dock" delivery and "drop shipment" charging. "Dock-to-dock" involves the wholesaler obtaining drugs in bulk from the manufacturer for direct delivery to a dispenser's own warehouse without taking the drugs into its own inventory. "Drop shipments" refer to when the manufacturer delivers the product directly to the customer, but the order and payment is made through the wholesaler. The combination of "drop ship" and "dock-to-dock" is known in the wholesaling industry as "brokerage."

Along with the delivery of pharmaceuticals, the wholesalers have a broad range of value added services that they can provide to their dispensing customers. These services are often not provided by the manufacturer and would be difficult and costly for the dispenser to reproduce them. Wholesalers have sophisticated ordering systems that allow customers to electronically order and confirm their purchases, as well as to confirm the availability and prices of wholesalers' stock. Wholesalers' inventory management systems help customers minimize inventory, customers can reduce inventory carrying costs while maintaining adequate inventory to meet patients' needs. Generic source programs enable wholesalers to combine the purchase volumes of customers and negotiate the cost of goods with generic manufacturers. Other services available from wholesalers include marketing and advertising programs, pharmacy networks for managed care plans, and software to assist with manufacturer bidding. Despite all of the services one wholesaler can provide to a customer, most customers have both a "primary" wholesaler and a "secondary" wholesaler. Given the custom-

---

4. A branded drug can either be sole source, meaning that it has no effective therapeutic equivalent, or multi-source, meaning that it has an effective therapeutic equivalent. It is unclear from the record whether wholesalers are generally excluded in the pricing discussions for both sets of branded drugs, or just sole-source branded drugs.

ers' immediate needs for prescription drugs, the secondary wholesaler acts as a backup to the primary wholesaler for the times the primary cannot fill the order.

Wholesalers primarily service three main classes of dispensers: (1) independent drug stores; (2) health care institutions; and (3) retail chains. In 1997, independents accounted for 27% of the wholesalers' total net sales; institutional dispensers 45%; and retail chains 24%.

1. *Independent Pharmacies:* Independent retail pharmacies, defined as having three or fewer stores, are commonly known as the "mom and pop" stores. There are currently 27,000 independent pharmacies in the United States. As a group, independent drugstores purchased 95.4% of their prescription drugs through wholesalers in the year ending December 31, 1997. *See* DXM 535. Independents bought the small remaining percentage of drugs directly from the manufacturers. Over the years, independents have increasingly joined group purchasing organizations ("GPOs") to gain greater leveraging power with wholesalers and manufacturers. While the GPOs do not purchase pharmaceuticals themselves or provide pharmaceutical distribution services, they use the aggregated purchasing power of their individual members to negotiate favorable contracts with manufacturers and wholesalers on behalf of their members.

2. *Institutions:* Institutional dispensers include hospitals, clinics, nursing homes, home health care providers, managed care providers, government agencies, and various alternate care providers. Institutional dispensers collectively purchase around 30 billion dollars per year in prescription drugs. *See* DXM 535. In 1987, health care institutions bought over 37% of their prescription drugs directly from the manufacturer. Today, they purchase only 20% directly from the manufacturer. The remaining 24 billion dollars of pharmaceuticals is distributed by the wholesalers. In particular, hospitals relied on wholesalers to deliver 85.3% of all of their prescription drug needs for the year ending December 31, 1997. *See* DXM 535. Of the 18 billion dollars of prescription drugs purchased by hospitals in the United States, more than 15 billion dollars was supplied by wholesalers. *See* DXM 535. Health care facilities generally demand a greater quantity of prescription drugs per location and a narrower range of items as compared to retail stores. Over the years, they have consolidated to form integrated delivery networks ("IDNs"), which are groups of hospitals, clinics, alternative care sites, and/or physician practices, usually located in the same metropolitan area. In 1997, the 35 largest IDNs posted gross revenues in excess of one billion dollars. Like independent pharmacies, institutions of all types—including individual hospitals, chains, and IDNs— have joined together to form GPOs. More recently, a number of institutional GPOs have combined to increase their purchasing power even further.[5]

3. *Retail Chains:* Retail chains, defined as having four or more stores, include drug stores, mass merchandisers, and food stores. The largest of the retail chains—Walgreens, Eckerd, CVS, and Rite–Aid—have annual sales of more than 12 billion dollars. *See* Roath Tr. 6/25/98, at 6. While they all rely on wholesalers to deliver a certain percentage of their pharmaceutical needs, the largest retail chains also maintain their own warehouses to supply drugs to their individual stores. Like wholesalers, self-warehousing chains receive the drugs in bulk from manufacturers, store the drugs in their own warehouses, and deliver the drugs to their retail outlets through their own distribution systems. Retail chains are the only dispensers of pharmaceuticals that self-warehouse to any significant extent. Large chains such as Rite–Aid and Eckerd have the capacity to self-warehouse up to 90% or so of the prescription drugs that are sold in their stores.[6] In general,

5. Novation, a new entity formed by the consolidation of two of the largest GPOs (VHA, with 1600 members, and University HealthSystem Consortium ("UHC"), with 88 univeristy-affiliated hospitals), represents 4.5 billion dollars in pharmaceutical purchasing power. Premier, which was created by the consolidation of three

GPOs, had 1,688 members in 1996 and two billion dollars in purchasing power.

6. Not all of the largest chains self-warehouse, however. Of the largest 50 retail chains in the United States, about half self-warehouse to some

retail chains have decreased their reliance on wholesalers. Manufacturers, that used to sell exclusively or principally to wholesalers, have increasingly agreed to sell more directly to the chains. From 1987 to 1997, retail chains increased the amount and percentage of pharmaceuticals they self-warehoused from 60.9% to 66.1% of their total purchases. During the same period of time, the amount and percentage purchased from wholesalers decreased from 39.1% to 33.9%. *See* Stipulation 1.

In the past few decades, a number of other significant trends aside from self-warehousing have occurred in the drug wholesale industry. As discussed previously, there has been substantial growth and rapid consolidation among the drug wholesalers. From 1978 to 1995, there was a 64% decline in the number of drug wholesalers operating in the United States. Of those disappearing companies, 85% left the market because they were acquired by another drug wholesaler. No new full-line wholesaler has entered the market since 1989. *See* Pulido Tr. 6/22/98, at 89–90; *cf.* P.'s Brief at 40 (alleging that there has been no new entry since 1981).

The pressure to reduce cost in the pharmaceutical industry as a whole has led both wholesalers and customers to seek economies of scale. Customers have consolidated as well. Over the past two decades, retail drug store chains have expanded exponentially through the acquisition of independent pharmacies and smaller chains. Hospitals have also merged to form chains. Both hospitals and retailers have organized GPOs that have merged with other GPOs.

Over the last two decades, wholesalers have increasingly lowered their prices and profit margins in order to compete. From 1980 to 1998, wholesale distributors' sell-side margins declined from 5.5% to 0.35%. In contrast, the wholesalers' buy-side margins only decreased from 5.5% in 1980 to 5.35% today. With such declining upcharges, any further decreases would seem to have to come principally from the buy-side margin

and not the sell-side. The ratio of sell-side to buy-side profits has shifted dramatically over time, reflecting the increasing negotiating power of customers. In 1980, the wholesalers' gross margins were 50% buy-side and 50% sell-side. Today they are 94% buy-side and 6% sell-side. *See* DXC 420.

## C. PROPOSED MERGERS

Defendants contend that the proposed mergers are the necessary reaction to the industry trends discussed above. They argue that the proposed mergers are their response to the mounting pressures to reduce cost, increase efficiency, and lower prices. After the mergers, the Defendants intend to begin an immediate plan of reorganization to lower cost and increase efficiency. Cardinal and Bergen announced that they plan to shut down and consolidate their combined 54 distribution centers into 29. This would include the opening of a few new facilities. Similarly, McKesson and AmeriSource publicly announced that they intend to consolidate their 54 distribution centers into 33, primarily by closing most of AmeriSource's existing facilities.

Cardinal initially approached Bergen about a merger in 1995. Bergen first rejected Cardinal's offer in 1995 and instead pursued a vertical integration program with its 1996 attempt to acquire Ivax, a generic manufacturer of drugs. When that acquisition fell through, Bergen began discussions with both AmeriSource and McKesson about a possible merger before being approached by Cardinal again in 1997. Pursuant to an Agreement and Plan of Merger dated August 23, 1997, Cardinal proposed to acquire all of the voting shares of Bergen for approximately 3.5 billion dollars in a stock-for-stock merger.

Once Cardinal announced its merger with Bergen, discussions between McKesson and AmeriSource quickly ensued. McKesson determined that a merger was necessary in order to compete with the Cardinal/Bergen

---

degree and the other half do not. *See* DXM 273. Kmart, for example, purchases all of its prescription drugs on consignment from Cardinal, even though it is a chain with more than 1540 stores and 1.5 billion dollars in prescription drug sales.

The term "consignment" refers to an arrangement whereby the wholesaler still owns the inventory in stock at the retail store and the retailer pays the wholesaler when the drugs are sold to the retail customer.

merger. On September 22, 1997, McKesson announced its Agreement and Plan of Merger to acquire all of the voting shares of AmeriSource for approximately 2.5 billion dollars in a stock-for-stock merger.

The FTC on March 3, 1998 authorized the commencement of two separate actions against the proposed mergers under Section 13(b) of the FTC Act to seek preliminary injunctions barring the completion of the mergers during the pendency of administrative proceedings. The FTC filed two separate complaints on March 9, 1998 for each transaction. On the motion of the Government with the consent of the parties, the Court consolidated the two cases.

At the initial status, Defendants represented that the transactions could not be held together for any substantial period of time. In light of this representation, the Court expedited discovery and held a seven week evidentiary trial commencing on June 10, 1998 and concluding on July 24, 1998. The FTC called nine witnesses, read the depositions of two other witnesses, offered the proffers of at least six witnesses, and presented the opinions of two economic experts on the likely market consequences and efficiencies of the proposed transactions. In addition to calling eighteen witnesses, the Defendants read the depositions of a number of witnesses, offered the proffers of at least eighteen more witnesses, and presented four of their own experts, who testified as to the anticipated efficiencies and likely market consequences of the proposed mergers. Combined, the parties submitted well over 2,000 exhibits for the Court's consideration. In addition to the submissions by the parties, 30 states [7] joined in an amicus brief filed in support of the FTC's request for an injunction.

In short, an extraordinary amount of documentation, testimony, and information was presented before this Court over the span of seven weeks. This was a profoundly professional job by all parties. They laid bare this industry in all of its sophisticated detail and business intricacy. What was revealed at trial was a well-run, efficient industry that exemplifies the best of a free-market system.

## II. ANALYSIS

### SECTION 13 (b) STANDARD FOR GRANTING INJUNCTIVE RELIEF

■ Under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), this Court may grant preliminary injunctive relief to the FTC if it finds, upon "weighing the equities and considering the Commission's likelihood of ultimate success," that the injunction would be in the public interest. *See also FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1074 (D.C.Cir.1981). Accordingly, to prevail under Section 13(b), the FTC must demonstrate: (1) a likelihood of success on the merits in its case under Section 7 of the Clayton Act; and (2) that the equities tip in favor of injunctive relief. *See, e.g., FTC v. Staples, Inc.*, 970 F.Supp. 1066, 1071 (D.D.C. 1997). Where the FTC has not established a likelihood of success on the merits, the Court cannot rely on the equities alone to justify the issuance of a preliminary injunction. *See FTC v. Owens–Illinois, Inc.*, 681 F.Supp. 27, 52 (D.D.C.1988), *vacated as moot*, 850 F.2d 694 (D.C.Cir.1988).

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits a corporation from acquiring "the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." It is conceded by the parties that the Defendants in this case are engaged in "commerce" as defined by Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

---

7. The states were: Arizona, Arkansas, California, Connecticut, Florida, Hawaii, Idaho, Illinois, Iowa, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Virginia, Washington, and West Virginia.

Pursuant to its statutory authority, when the FTC believes that a proposed merger may be in violation of the anti-trust provisions of the Clayton Act, it has the right to seek a preliminary injunction to block the merger pending a full administrative proceeding. *See* 15 U.S.C. § 53(b). To be awarded preliminary injunctive relief, the Commission need not prove that the proposed merger would in fact violate Section 7 of the Clayton Act. *See FTC v. Staples, Inc.,* 970 F.Supp. 1066, 1070 (D.D.C.1997); *FTC. v. Alliant Techsystems Inc.,* 808 F.Supp. 9, 19 (D.D.C.1992). "The determination of whether the acquisition actually violates the antitrust laws is reserved for the Commission and is, therefore, not before this Court." *FTC v. Staples,* 970 F.Supp. at 1071; *see also FTC v. Alliant,* 808 F.Supp. at 19. To prevail, the FTC needs to prove only that it is likely to succeed on the merits of its case in a full administrative proceeding. The Commission meets this burden if it can raise "questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the Commission in the first instance and ultimately by the Court of Appeals." *FTC v. University Health, Inc.,* 938 F.2d 1206, 1218 (11th Cir.1991); *see also FTC v. Warner Communications, Inc.,* 742 F.2d 1156, 1162 (9th Cir.1984); *FTC v. National Tea Co.,* 603 F.2d 694, 698 (8th Cir.1979); *FTC v. Staples,* 970 F.Supp. at 1071; *FTC v. Alliant,* 808 F.Supp. at 19. While some would dispute what this standard means, it is well settled in the case law that for the government to succeed, it "must show a reasonable probability that the proposed transaction would substantially lessen competition in the future." *FTC v. University Health,* 938 F.2d at 1218; *see also FTC v. Staples,* 970 F.Supp. at 1072.

For this Court to consider the likely competitive effects of the transactions, it must first define the relevant product and geographic boundaries of the markets in question. As the Supreme Court stated in *United States v. Marine Bancorporation,*

418 U.S. 602, 618, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974), "determination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act." (quoting *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957)). *du Pont de Nemours & Co.,* 353 U.S. at 593, 77 S.Ct. 872.

1. Relevant Product Market

Defining the relevant market is the starting point for any merger analysis. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *see also* 1992 United States Department of Justice and the Federal Trade Commission Horizontal Merger Guidelines § 1.1 (hereinafter "Guidelines"). Defining the relevant market is critical in an antitrust case because the legality of the proposed mergers in question almost always depends upon the market power of the parties involved.[8]

In this case, the parties dispute the nature and scope of the relevant product market. The parties concede that in 1997, the total of all of the pharmaceutical sales in the United States was 94 billion dollars, 54 billion dollars of which was distributed through drug wholesalers. The other 39 billion dollars was distributed either directly by the manufacturers, through self-distribution, or through other alternative means such as mail order distribution. The FTC contends that the relevant product market is limited to the 54 billion dollar industry which specializes in the wholesale distribution of prescription drugs. The Defendants allege that the market as defined by the FTC is far too narrow. They claim that the relevant market in which to assess the likely competitive effects of the proposed mergers is the larger, 94 billion dollar prescription drug industry. In 1997, the wholesalers combined distributed only 57% of the total to be distributed. Upon careful consideration of all of the evidence presented in this case, the Court finds that the relevant product market is the wholesale

---

8. This is because under Section 7 of the Clayton Act, enforcement of the anti-merger provisions proceeds from the premise that when a small group of firms occupies a large share of the relevant market, the firms can more easily coordinate sales policies in order to raise prices above competitive levels.

46

distribution of prescription drugs, as advanced by the FTC.

■ In defining the relevant market, the Court is guided by the Supreme Court's leading opinion in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962): "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* at 325, 82 S.Ct. 1502. In other words, when one product is a reasonable substitute for the other, it is to be included in the same relevant product market even though the products themselves are not the same. A product is construed to be a "reasonable substitute" for another when the demand for it increases in response to an increase in the price for the other. Because the ability of customers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the "relevant market" rests on a determination of available substitutes. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *see also Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.*, 714 F.2d 351, 356 (4th Cir.1983), *cert. denied*, 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984). The degree to which a similar product may be substituted for the product in question—in this case, wholesale drug distribution—is said to measure the cross-elasticity of demand, while the capability of other production facilities to be converted to produce a substitute product is referred to as the cross-elasticity of supply. The higher these cross-elasticities, the more likely it is that the alternative products are to be counted in the relevant market. In other words, the relevant market consists of all of the products that the Defendants' customers view as substitutes to those supplied by the Defendants. Thus, in this case, if enough customers view other forms of prescription drug delivery methods as acceptable substitutes to the services provided by the Defendants, then the relevant market should include these alternative methods. On the other hand, if customers do not view the other methods of distribution as viable substitutes, then the relevant product market

should be limited to the wholesalers' services. *See E.I. du Pont de Nemours*, 351 U.S. at 393, 76 S.Ct. 994. Accordingly, the Court must determine whether, based upon the evidence presented at trial, there is reason to find that if the Defendants were to raise prices after the proposed mergers, their customers would switch to alternative sources of supply to defeat the price increase.

■ In addition to the cross-elasticity of demand and supply, the Court in *Brown Shoe*, 370 U.S. 294, 82 S.Ct. 1502, set forth additional "practical indicia" as guides for defining the appropriate market. Among them were "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct consumers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 325, 82 S.Ct. 1502. However, courts have gone on to clarify that the determination of the relevant market in the end is "a matter of business reality—[ ]of how the market is perceived by those who strive for profit in it." *FTC v. Coca–Cola Co.*, 641 F.Supp. 1128, 1132 (D.D.C.1986); *vacated as moot*, 829 F.2d 191 (D.C.Cir.1987); *Rothery Storage & Van Co. v. Atlas Van Lines*, 792 F.2d 210, 219 (D.C.Cir.1986) ("The industry or public recognition of the submarket as a separate economic unit matters because we assume that economic actors usually have accurate perceptions of economic realities."); *see also United States v. Continental Can Co.*, 378 U.S. 441, 449–58, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); *United States v. Aluminum Co. of America*, 377 U.S. 271, 275–77, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). It is imperative that the Court, in determining the relevant market, take into account the economic and commercial realities of the pharmaceutical industry. *See Brown Shoe*, 370 U.S. at 336, 82 S.Ct. 1502; *see also United States v. Continental Can Co.*, 378 U.S. 441, 449, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964).

■ In this case, the FTC characterizes the wholesale drug industry as a "unique cluster of products and services" provided

only by the wholesalers, for which the FTC claims there are no reasonable substitutes. To support this argument, the FTC at trial presented evidence demonstrating the uniqueness of the drug wholesale industry and highlighting the differences between the services provided by wholesalers and the other sources of supply. Based upon this evidence, the FTC contends that the distribution of prescription drugs by means other than wholesalers, including direct purchases from manufacturers, mail orders, and self-warehousing, should be excluded from the relevant product market because they are not alternative sources that customers reasonably could turn to in response to the Defendants' exercise of its increased market power.

Defendants presented evidence at trial to rebut the contention that wholesale drug distribution is a distinct market. Defendants describe themselves as "middlemen" who take delivery of pharmaceutical products in bulk from manufacturers, warehouse the products, and then deliver them to various dispensers. While they admit that they provide valuable services to their customers, Defendants argue that their function in the delivery chain can easily be substituted by other wholesalers, manufacturers, or by customers themselves. According to the Defendants, wholesale distribution does not involve any scarce resource, input, or expertise that would distinguish it from the other channels of drug distribution. According to the Defendants, the other forms of distribution perform the same basic function as they do, and as such, are "reasonably interchangeable" substitutes. The potential for substitution, Defendants claim, serves as a constraint upon them, thereby justifying that the relevant product market include manufacturers and self-warehousers as viable competitors.

While the additional services provided may vary from one form of distribution to another, this Court finds that the actual function of drug delivery from manufacturers to dispensers is basically the same regardless of the distributor. The parties cannot deny that various methods of distribution exist within the pharmaceutical industry. Thus, the Court recognizes that there is, in fact, a broader market encompassing the delivery of prescription drugs by all forms of distribution. All the forms of distribution must, at some level, compete with one another. However, "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *Federal Trade Commission v. Staples, Inc.*, 970 F.Supp. 1066, 1075–1076 (D.D.C.1997). "The Supreme Court has recognized that within a broad market, 'well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.'" *Id. (quoting Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)); *see also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 218 (D.C.Cir. 1986).

After carefully considering all of the evidence presented at trial, this Court finds that the services provided by wholesalers in fact comprise a distinct submarket within the larger market of drug delivery. The business of wholesale drug delivery is considerably more sophisticated than merely "picking and packing" as suggested by the Defendants throughout the trial. The evidence presented by the FTC clearly demonstrates that wholesalers provide customers with an efficient way to obtain prescription drugs through centralized warehousing, delivery, and billing services that enable the customers to avoid carrying large inventories, dealing with a large number of vendors, and negotiating numerous transactions. The value of this service is underscored by the additional services offered by the Defendants, which the evidence overwhelmingly shows are provided only by certain wholesalers. According to the FTC, if the Defendants were to merge and engage in anti-competitive practices, a large segment of Defendants' customers—namely hospitals and independent pharmacies—would have no reasonable substitutes.

On the other hand, Defendants contend that the FTC's definition of the relevant product market fails to take into account the economic realities of the larger 94 billion dollar drug industry. According to the De-

fendants, the FTC's definition of the relevant market inflates the Defendants' supposed market shares by "assuming away nearly half the market—the self-distribution portion." *See* Ds.' Opp. Brief at 5. The Defendants presented evidence at trial to show that chain pharmacies now frequently substitute self-distribution for the services of the wholesalers and would do so to an even greater extent in the event of a future price increase. Thus, the Defendants contend that self-warehousing and distribution by chain pharmacies present a significant competitive challenge to the wholesalers and should properly be included within the relevant market.

The Court is persuaded that within the overall industry, different classes of customers have varied ability to substitute the services currently provided by wholesalers. Whereas the FTC is correct in pointing out that hospitals and independent pharmacies continue to rely on wholesalers for a significant portion of their delivery needs, the Court also finds merit to the Defendants' position that a certain, yet significant, portion of the large retail chains can themselves reasonably provide a substitute for Defendants' services. Evidence shows that, in recent years, a growing number of retail pharmacy chains substituted the services provided by wholesalers through self distribution. Accordingly, this suggests to the Court that the large chain pharmacies not only play a part in the smaller 54 billion dollar market defined by the FTC, but that they also have access to the larger, 94 billion dollar market as defined by the Defendants. Courts have generally recognized that when a customer can replace the services of a wholesaler with an internally-created delivery system, this "captive output" (i.e. the self-production of all or part of the

relevant product) should be included in the same market.

However, with regard to hospitals, independent pharmacies, and non-warehousing retail chains, the Court finds that the alternatives suggested by the Defendants such as captive production cannot be included within the relevant product market. As the Merger Guidelines state, although captive production can be considered by the Court, it can only be considered to the extent that "such inclusion reflects [its] competitive significance in the relevant market prior to the merger." Guidelines § 1.31; *see also United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir., 1945); *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 278 (5th Cir.1978); *In re Int'l Tel. & Tel. Corp.*, 104 F.T.C. 280, 410–11 (1984). Numerous customers testified at trial that they would not increase their direct purchases from manufacturers or consider self-distribution in the event of anti-competitive practices. The evidence reflects that the majority of customers have increasingly relied on the services of wholesalers, moving away from direct purchases from manufacturers and self-distribution. For example, evidence presented at trial shows that as of 1997, independent pharmacies and hospitals relied on wholesalers for over 80% of their drug delivery needs, which was a substantial increase from ten years ago.[9] Hospitals purchased only 14.7% of their total dollar volume directly from the manufacturers and warehoused virtually no portion of that demand. Similarly, independent pharmacies directly purchased only 4.4% of their total dollar volume, and self-warehoused less than 1% of their total prescription drug sales. Based on this evidence, it does not appear plausible that the other methods of drug distribution that are not currently perceived as real substitutes for

---

**9.** Defendants' Exhibit 535 provides data showing the forms of distribution used by each class of customers in 1997:

### 1997 Pharmaceutical Distribution (DXM 535)

| | DIRECT PURCHASES | WHOLESALER PURCHASES | SELF–WARE-HOUSING |
|---|---|---|---|
| HOSPITALS | 14.7% | 85.3% | 0.0% |
| INDEPENDENT PHARMACIES | 4.4% | 95.4% | 0.3% |
| CHAIN PHARMACIES | 2.3% | 24.3% | 73.5% |

the Defendants' services would suddenly become so in the event of a merger and subsequent exercise of market power.

Business and economic realities of this industry demonstrate that the other forms of distribution lack the practical availability to be included within the relevant product market. Evidence presented at trial shows that most customers are not vertically-integrated. Dispensers who self-warehouse are overwhelmingly limited to a small segment of retail chain pharmacies. Thus, this Court finds that the majority of Defendants' customers cannot replicate the wholesalers' services themselves nor obtain them from any other source or supplier. Clearly, the independent pharmacy does not have access to the major retail chain's warehouse.

Moreover, it should be noted that internal documents presented at trial reveal that the Defendants themselves do not view the other forms of distribution to be viable competitors or substitutes. The Defendants' documents show that the merging parties clearly viewed their economic competition to be from their fellow drug wholesalers, and not from the other sources as suggested by the Defendants at trial.[10] Based on this evidence, it is clear to this Court that while there is no denying that the actions of manufacturers and retail chains affect the scope and size of the Defendants' market share on some level, the Defendants clearly operate within an economically distinct submarket of the larger, overall industry. In light of the economic realities of the industry, this Court finds that the 54 billion dollar wholesale market is the relevant product market in which to assess the likely competitive effects of the proposed mergers.

## 2. Relevant Geographic Market

■ Before the FTC can identify the necessary market concentrations and address the likely competitive effects, it must next define the relevant geographic market in which to examine the proposed mergers. For Clayton Act purposes, the Supreme Court has defined the relevant geographic market as the region "in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). More recently, the Eighth Circuit Court of Appeals elaborated on the Supreme Court's analysis, determining that the relevant geographic market is the area "to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir.1994), *cert. denied*, 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (1995). The geographic market need not be identified with "scientific precision," *United States v. Connecticut National Bank*, 418 U.S. 656, 669, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974), or "by metes and bounds as a surveyor would lay off a plot of ground." *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) (citations omitted). Nonetheless, the relevant geographic market must be sufficiently defined so that the Court understands in which part of the country competition is threatened. The FTC's failure to sufficiently define the relevant geographic market can be grounds to deny the requested injunction. *See e.g., FTC v. Freeman Hospital*, 69 F.3d 260, 271–72 (8th Cir. 1995); *FTC v. Southland Corp.*, 471 F.Supp. 1, 5–6 (D.D.C.1979).

■ In this case, the FTC contends that several geographic markets exist in which competition will likely be threatened. The FTC claims that there exist: (1) a national market for those large customers which require national service; and (2) regional markets for the smaller regional customers. With regard to the national market, the FTC

10. For example, an internal document from Amerisource shows a pie chart depicting "Industry Composition: Strong Dominanance in Established Markets," and includes in the chart only McKesson, Cardinal, Bergen, Amerisource, and "Others" as the relevant players in the defined product market. *See* PX 107. Similarly an internal document from Cardinal Corp. reveals a pie chart defining the "U.S. Pharmaceutical Wholesale Market," and includes in that relevant market only McKesson, Bergen, Cardinal Health, Amerisource and Others. *See* PX 101. An internal document from McKesson defines the relevant product market as "Leading U.S. Wholesale Distributors," and refers to that market therein as its "business." *See* PX 671.

asserts that a large number of customers exist that purchase nationally, including large chain retailers, hospital chains, hospital GPOs, and some independent pharmacy buying groups. Moreover, the FTC presented evidence at trial to suggest that competition on the national level for such customers' business also has an effect on the prices paid by local customers at a local level. In its claim for regional markets, the FTC argues that many regional markets, no matter how they are defined, will be highly concentrated following these transactions, and considerably more concentrated than the national market as a whole. In particular, the FTC emphasizes the high levels of concentration in the Los Angeles, San Francisco, and Seattle markets.

The Defendants contend that only a national market exists. With regard to the claimed regional markets, the Defendants allege that the FTC failed to meet its burden of definition. They contend that the FTC did not sufficiently define the claimed regional markets. At trial, the Government largely used commercial maps created by the Rand McNally Company to serve as proxies for the claimed regional markets. Specifically, Rand McNally's maps identify Major Trading Areas ("MTAs") and extended MTAs in the United States. The Defendants claim these commercial definitions relied upon by the Government are inaccurate and unsuited for the purposes of this trial. The Defendants also claim that Government's position is untenable because when the FTC calculated the market shares of the Defendants in each of the claimed regions, it failed to distinguish sales to national customers from sales to regional customers. As the only national wholesalers to serve national customers, Defendants contend that the Government's failure to exclude from each of the regional markets business to nationals tends to overstate the Defendants' regional marketshares. They allege that the Government's figures do not accurately reflect the Defendants' share of the business to regional customers in the claimed regional markets.

(1) *National Market:* With regard to the national market, this Court finds that the FTC has proven, and the Defendants have conceded, that the wholesale industry is largely driven by the competition that takes place on a national level. Even though there are regional customers that do not require national service, evidence produced at trial established that pricing in one region to one customer often affects pricing nationwide. Furthermore, evidence showed that many GPOs negotiate contracts with several wholesalers, making the same prices available throughout the country to all of their members—local, regional, or national. *See United States v. Grinnell Corp.,* 384 U.S. 563, 575, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (determining that the relevant geographic market was national where defendants had "a national schedule of prices, rates, and terms, though the rates may [have been] varied to meet local conditions."). In light of the evidence presented at trial, this Court finds that the United States is a relevant geographic market for the drug wholesale industry.

(2) *Regional Markets:* In addition to the national geographic market, the FTC sought to establish at trial that certain regional markets also exist in which competition would be substantially threatened after the mergers. The FTC presented evidence identifying the Los Angeles, San Francisco, and Seattle markets as specific examples of the lack of competition that would result in the western half of the United States. The FTC's economic expert, Professor Carl Shapiro, largely relied upon MTAs and Extended MTAs to define the regional markets. In addition, Professor Shapiro analyzed the 300 mile radius around the particular cities identified as MTAs. The FTC then calculated market shares within each of the defined regions based upon the sales of distribution centers located within those regions.

This Court finds that the regional markets were not sufficiently defined at trial. Specifically, the Court finds that: (1) the delineation of the regions was relatively inaccurate; (2) the Government failed to distinguish between regional customers and national customers when it calculated market shares; and (3) the MTAs and Extended MTAs relied upon by the FTC were not created for antitrust purposes and thus not wholly credible or reliable.

In calculating market share data, the FTC failed to account for sales made from distribution centers outside a region to customers located within that region; instead, the FTC only calculated market share data based upon shipments from distribution centers within a region, no matter the destination of those shipments. Based upon this evidence, the Government's expert acknowledged that the MTAs are not entirely accurate, describing them as "born to leak," *see* DXC 475, and that shipments across regional boundaries make it difficult to get an accurate calculation of regional market shares. At trial, the FTC conceded that the MTAs, the extended MTAs, and the 300–mile regions do not sufficiently address the problem of customers buying from distribution centers outside the claimed boundaries.

Furthermore, for each claimed regional market, the FTC failed to distinguish between market shares with regard to national customers and market shares with regard to regional customers within each region. The FTC made no effort at trial to measure specific sales to regional customers in these regional markets; instead, the FTC calculated market share data based upon sales to all customers—regional and national—in each of these claimed regional markets. Thus, the Government did not produce data at trial that accurately reflected the Defendants' market shares with regard to regional customers in the claimed regional markets.

In addition, since the MTAs and Extended MTAs were defined by Rand–McNally for purposes unrelated to the enforcement of the anti-trust laws, the evidence based upon such information cannot be wholly relied upon by this Court. *See United States v. Connecticut National Bank*, 418 U.S. 656, 670, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974) (holding that the government could not rely upon Standard Metropolitan Statistical Areas established by the Office of Management and Budget because they were "not defined in terms of banking criteria, and they were not developed as a tool for analyzing banking markets."); *see also FTC v. Southland Corp.*, 471 F.Supp. 1, 3–4 (D.D.C.1979).

The FTC maintains that the MTA data is helpful in establishing the existence of regional markets in the pharmaceutical wholesale industry. The Government argues that the regions with significantly higher market concentrations should be considered as relevant geographic markets distinct from, and in addition to, the national geographic market.

Despite the statistical inaccuracies, this Court finds that certain regional markets are distinct enough to realize the lack of competition that will result should these mergers be approved. Although this Court is not persuaded that all of the MTAs should be considered as separate geographic markets, it does find that several specific MTAs appear particularly concentrated and in danger of facing considerable anti-competitive effects should these two mergers go forward.

In the western half of the United States, where regional wholesalers are small in both size and number, numerous witnesses demonstrated at trial a significant lack of competition among the wholesalers aside from the Defendants. In particular, Professor Shapiro showed that there are no regional wholesalers of any importance on the West Coast. Valley Drug and Barnes, two of the largest West Coast regional wholesalers, have only about one million dollars in revenues per year. Professor Shapiro further showed that the four Defendants are the only competitors within 300 miles of Seattle, *see* PX 530, and that the four Defendants have close to 90% of the market share in the Los Angeles Extended MTA, which includes Phoenix, Salt Lake City, and San Francisco. *See* PX 526.

The uncontested evidence shows that the Los Angeles, San Francisco, and Seattle regions are particularly concentrated and would be vulnerable to anti-competitive practices should the injunction be denied. Therefore, this Court finds that the regions surrounding these three cities along the West Coast are relevant geographic markets to be considered.

While the western part of the United States merits significant concern, the Court finds there is less reason to fear potential anti-competitive effects in the eastern half of the United States. At trial, both parties presented evidence to suggest that the De-

fendants face considerable competition by strong and vigorous wholesalers on the Eastern Seaboard, including but not limited to Bindley Western, Neuman Distributors, Kinray, C.D. Smith, and Morris & Dickson. The evidence indicates that the existence of numerous regional wholesalers in the eastern half of the United States has kept the four Defendants competitive in their pricing practices and should continue to do so in the future. For example, in the region surrounding New York City, Neuman and Kinray fiercely compete with Defendants for the wholesale pharmaceutical business in the area, particularly for local institutional customers. Senior officers of Bindley Western and Neuman Distributors testified at the trial. This Court finds them to be as capable and sophisticated in the running of their business as the CEOs of the four Defendants. Given the existence of such competitive regional wholesalers, the Court finds that even with the mergers, the eastern part of the United States will likely remain more competitive than the western half of the United States.

### 3. Probable Effect on Competition

#### a. *Prima Facie Case of an Increase in Market Concentration*

■ The Court must begin its analysis of assessing the likely competitive effects of the proposed transactions by determining the market shares of the merging firms and the level of concentration in the relevant market. Generally, under Section 7 of the Clayton Act, a prima facie case can be made if the government establishes that the merged entities will have a significant percentage of the relevant market—enabling them to raise prices above competitive levels.[11] The Su-

preme Court announced in *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), that a merger which significantly increases the share and concentration of firms in the relevant market is "so inherently likely to lessen competition" that it must be considered presumptively invalid and enjoined in the absence of clear evidence to the contrary. *See also Baker Hughes*, 908 F.2d 981, 982–83 (D.C.Cir.1990); *PPG Industries, Inc.*, 798 F.2d 1500, 1502–03 (D.C.Cir.1986). Specifically, the Court held that a post-merger market share of 30% or more could establish a prima facie case of the lack of competition. *See Philadelphia Nat'l Bank*, 374 U.S. at 364, 83 S.Ct. 1715 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."). Subsequent cases have lowered the presumption somewhat to even 25% or less. *See United States v. Aluminum Co.*, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); *United States v. Continental Can Co.*, 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964).

In this case, the market shares resulting from the proposed mergers would clearly cross the 30% threshold. According to the most recent data provided in 1997, McKesson had a 24.9% share of the drug wholesale market; Bergen had 22.4%; Cardinal had 17.5%; and AmeriSource had 12.3%. The next largest drug wholesaler, Bindley Western, had only a 4.35% share; followed by Neuman with 2.66%; Morris & Dickson with 1.69%; C.D. Smith Drug with 1.41%; D & K Wholesale Drug with 1.07%; and Kinray with 1.03%. *See* PX6 (revised). None of the remaining wholesalers had a market share

---

11. The Defendants represented to the public and to this Court on numerous occasions that they will not raise prices after the mergers. In fact, they have gone on the record to promise that at least 50% of the cost savings achieved through the mergers will be passed on to its customers. Given these representations on the record and in the public filings, this Court is satisfied that the Defendants will not raise prices after the mergers.

The FTC needlessly overstated its case and scared the American consumer when it announced in its initial press release that these

mergers would result in "higher prices for prescription drugs and a reduction in the timely delivery of these drugs to hospitals, nursing homes and drugstores, which could affect patient care." DXC 262. As the government conceded at trial, the fear that Defendants would raise prices above the current levels was never really at issue. Over the past ten years, as a result of competition, prices have consistently fallen for wholesale services. The real anti-competitive concern before this Court is whether the mergers would forcibly slow down the otherwise steady decline in prices.

greater than 0.88%. Based on this data, after the proposed mergers, the two firms clearly would dominate the competition with close to 80% of the pharmaceutical wholesale market.

Even if this Court were to define the relevant market to account for captive capacity, the post-merger market shares of the Defendants would still cross the 30% threshold. Including only the wholesalers' sales to independent pharmacies, McKesson in 1997 had a 30% share; Bergen had 14%; Cardinal had 9%; and AmeriSource had 11%. Post-merger, the two remaining firms would control 63% of the wholesale market to independent pharmacies. Including only sales to institutional facilities, McKesson in 1997 had a 13% share; Bergen had 18%; Cardinal had 19%; and Amerisource had 13%. After the merger, the two firms together would have an 63% share of that market. Regardless of how one were to define the relevant drug wholesale market, whether it would include business to all or only some of its customers, the merged firms would control a significant share of all of the markets.

In addition to market share, the level of concentration in the relevant market is the other factor to be considered under *Philadelphia Nat'l Bank,* 374 U.S. at 363, 83 S.Ct. 1715. To measure market concentration more accurately than in the past, economists devised a statistical measure called the Herfindahl–Hirschman Index (HHI), which calculates market concentration by summing the squares of the share of each participant in the market. The FTC and the anti-trust division of the Justice Department adopted the HHI as the preferred measure of market concentration in their 1992 Horizontal Merger Guidelines ("Guidelines"). *See* Guidelines § 1.5. While the Guidelines are not binding, they constitute the agencies' informed judgment on the area of their expertise. Accordingly, the courts turn to the Guidelines for assistance and over the years have come to accept the HHI as the most prominent and accurate method of measuring market concentration. *See, e.g., FTC v. University Health, Inc.,* 938 F.2d 1206, 1211 n. 12 (11th Cir.1991); *FTC v. PPG Indus., Inc.,* 798 F.2d 1500, 1503 (D.C.Cir.1986); *FTC v. Staples, Inc.,* 970 F.Supp. 1066, 1081–82 (D.D.C.1997).

According to the Guidelines, a market with an HHI of less than 1000 would be an uncon-. centrated market; an HHI of 1000 to 1800 would be moderately concentrated; and an HHI of over 1800 would be highly concentrated. The Guidelines state that if the proposed mergers were to create a highly concentrated market and increase the HHI over 50 points, the mergers would raise significant competitive concerns unless mitigated by other factors. If the proposed mergers were to create a highly concentrated market and increase the HHI over 100 points, the Guidelines state that it would be presumed that the mergers create a lack of competition. *See* Guidelines § 1.51

If the mergers were to be approved by this Court, the level of concentration in the market would increase dramatically according the HHI. Using the last set of complete data in 1996, the FTC calculated that the current pharmaceutical wholesale market was only moderately concentrated, with an HHI of approximately 1648. *See* PX 5. The Cardinal/Bergen merger alone would create a highly concentrated market, with an approximately 802 point increase in the HHI, raising the · total market index from 1648 to 2450. *Id.* Similarly, the McKesson/AmeriSource merger alone would increase the HHI by approximately 629 points, from 1648 to approximately 2277. *Id.* If both of the mergers were consummated, the level of concentration in the market would almost double, from an HHI of approximately 1648 to 3079. *Id.* Not only would this be a significant increase in the HHI, but it would also raise the HHI to a level far beyond that of a highly concentrated market. Given the projected increases in the HHI, the Court must presume that the proposed mergers pose a risk to competition.

Even if this Court were to exclude from the market the wholesale business to retail chains, taking into account their ability to self-substitute, the post-merger levels of concentration in the market would still be high enough to trigger the presumption. Using the full set of data from 1996, the HHI index for the hospital and institutional drug wholesale market would increase from approximately 1774 to 3507—from a moderately concentrated market to a highly concentrated

one. *See* PX 7. Similarly, for the wholesale market to independent pharmacies, the HHI index would rise from approximately 1341 to 2224 if both of the mergers were to be approved. *See* PX. 498. The total market share and substantial increase in market concentration that would be produced by the proposed transactions far exceed the threshold limit that the Supreme Court established as raising a presumption of illegality under Section 7 of the Clayton Act. *See Philadelphia Nat'l Bank,* 374 U.S. at 364, 83 S.Ct. 1715. Given the projected measures of market share and market concentration after the mergers, this Court finds that the Commission has made out a prima case of anticompetition.

### b. Rebuttal of the Prima Facie Case

■■■ Although the ultimate burden of persuasion always rests with the FTC, once a presumption has been established that the proposed transactions will substantially affect competition, the burden of production shifts to the Defendants to rebut the presumption. *See United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 613, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). To meet their burden, the Defendants must show that the market-share statistics mentioned above "give an inaccurate prediction of the proposed acquisition's probable effect on competition." *FTC v. Staples, Inc.,* 970 F.Supp. at 1083 (citing *United States v. Baker Hughes, Inc.,* 908 F.2d 981, 991 (D.C.Cir.1990); *Marine Bancorporation,* 418 U.S. at 631, 94 S.Ct. 2856). As the Supreme Court stated in *Brown Shoe:*

> Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history, and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger.

370 U.S. at 322 n. 38, 82 S.Ct. 1502; *see also United States v. General Dynamics Corp.,* 415 U.S. 486, 498, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). Since a merger is to be "functionally viewed, in the context of its particu-

lar industry," *Brown Shoe* established such factors as:

> "whether the consolidation was to take place in an industry that was fragmented rather than concentrated, that had seen a recent trend toward domination by a few leaders or had remained fairly consistent in its distribution of market shares among the participating companies, that had experienced easy access to market by suppliers and easy access to suppliers by buyers or had witnessed ... the ready entry of new competition or the erection of barriers to prospective entrants, all were aspects, varying in importance with the merger under consideration, which would properly be taken into account." 370 U.S. at 322, 82 S.Ct. 1502 (footnote omitted).

Specifically, the Defendants contend that the following factors sufficiently rebut the FTC's prima facie case: (1) the ability of customers to substitute Defendants' services through self-distribution; (2) the other 40 plus wholesalers' ability to compete for Defendants' business; (3) the ease of entry and expansion into the market; (4) the existence of power buyers; and (5) the efficiencies to be gained from the mergers. *See* DXC 528. While all of these factors are relevant for the Court "in determining whether a transaction is likely to lessen competition substantially, ... none is invariably dispositive." *United States v. Baker Hughes Inc.,* 908 F.2d 981, 985 (D.C.Cir.1990). In the end, the Court must weigh the Defendants' rebuttal case with the Government's proof that the mergers will likely lessen competition in the market.

The Defendants' contention that self-distribution is a viable form of substitution for all classes of Defendants' customers has already been addressed by this Court in Part II, Section Al. Defendants' claim that the other smaller wholesalers can vigorously compete for Defendants' business has been addressed in part in the Court's discussion of regional versus national geographic markets. It will further be addressed by this Court in its discussion of the ease of entry and expansion in the market.

(1) *Ease of Entry:* Ease of entry is the ability of other firms to respond to collusive pricing practices by entering to compete in

the market. Even in highly concentrated markets, if there is sufficient ease of entry, enough firms can enter to compete with the merging firms, undercutting any of the likely anti-competitive effects of the proposed mergers. In other words, entry is one way in which post-merger pricing practices can be forced back down to competitive levels. Determining whether there is ease of entry hinges upon an analysis of barriers to new firms entering the market or existing firms expanding into new regions of the market. *See Baker Hughes, Inc.,* 908 F.2d 981, 987 (D.C.Cir.1990) ("The existence and significance of barriers to entry are frequently, of course, crucial considerations in a rebuttal analysis."); *see also United States v. Waste Management,* 743 F.2d 976, 983 (2d Cir. 1984). A court's finding that there exists ease of entry into the relevant product market can be sufficient to offset the government's prima facie case of anti-competitiveness. The FTC's own Merger Guidelines state that where ease of entry exists, "the merger raises no antitrust concern and ordinarily requires no further analysis." Guidelines § 3.0. According to the Guidelines, ease of entry must be proven to "be *timely, likely, and sufficient* in its magnitude, character and scope to deter or counteract the competitive effects of concern." Guidelines § 3.0 (emphasis added). The Court of Appeals for this Circuit affirmed the use of ease of entry analysis in *United States v. Baker Hughes,* 908 F.2d 981, 987 (D.C.Cir.1990).

Defendants contend that the ease of entry into the pharmaceutical wholesale market effectively rebuts the Government's prima facie case. Despite the greater market concentration resulting from the mergers, the Defendants claim that the entrance of new competitors, and or the expansion of existing competitors, would act as a constraint on any possible anti-competitive practices. According to the Defendants, entry into or expansion within this industry does not require large amounts of capital or the acquisition of any scarce resources. In support, the Defendants cite to recent examples of expansion by existing regional wholesalers. They presented further evidence at trial to suggest that companies from other industries (i.e. Federal Express, United Parcel Service, and other transportation companies) not yet in the market would likely enter should the competitive environment change after the mergers.[12]

In response, the FTC contends that the history of this market indicates that ease of entry would not effectively counter any of the Defendants' possible anti-competitive practices after the mergers. The evidence produced at trial showed that in the past twenty years, new entrants have been few and far between in the pharmaceutical wholesale market. The existing "fringe" firms have not increased their market shares to any significant extent in many years. In addition, the FTC claims that a lack of necessary capital and expertise act as real barriers to entry into the market.

*Timeliness of Entry:* The first step in determining ease of entry is timeliness: According to the Guidelines, timely entry is limited to "only those committed entry alternatives that can be achieved *within two years* from initial planning to significant market impact." Guidelines § 3.2 (emphasis added). At trial, the FTC presented evidence to suggest that opening new distribution centers to compete with the Defendants after the mergers would simply take too long: Bergen took 2½ years to build a new, automated distribution center in Richmond; McKesson estimated it would take 2 years to relocate its Detroit distribution center; Bergen estimated that it would take 18–24 months to "build to suit" a new facility while Cardinal estimated it would take 12–18 months. *See* Roden Tr. 6/30/98 at 124–26;

---

12. Homer Dunn, the President of NonStop Solutions and Defendants' logistics expert, whose overall testimony the Court found fascinating, made the point that the transportation phase of the services provided by wholesale distributors could easily be performed by the various transportation firms active in the marketplace such as UPS and Fed Ex. Because Dunn makes so much sense in the homespun way he goes about solving complex problems, it is hard to refute his logic on this point. However, other than Dunn's prognostication, the record does not substantiate the Dunn view at this time. Even if Dunn were correct, the timing for such entry by the transportation firms would be difficult to forecast.

PX 433 at 4536; PX 430 at 0007; PX 421 at 0879.

This Court finds that opening a new distribution center need not take as long as the Government contends. Defendants successfully established at trial that a company does not need to build a new distribution center, or even purchase an existing one, to enter the market. The evidence at trial indicated that leasing distribution centers instead of buying was an equally viable alternative. Numerous witnesses testified that a leased distribution center could open within as little as 90 days. Moreover, the CEOs of all four Defendants represented on the record that the distribution centers left over from their post-merger consolidations would be made immediately available to any interested parties.

In determining whether existing regional wholesalers could expand or whether others could enter the market in a timely fashion, the Court must consider the companies' ability to obtain the necessary resources. *See State of California v. American Stores*, 872 F.2d 837, 843 (9th Cir.1989). The FTC contends that the primary barrier to entry is the large amount of capital required:[13] (1) *to obtain and equip a new distribution center*; (2) to maintain the necessary amount of inventory required to keep a distribution center; and (3) to develop or acquire the technology needed to enable services to be competitive with the other wholesalers. Yet the FTC's own economic expert testified at trial that "if you had enough money and the expertise, you could enter [the market]." Shapiro Tr. 6–11–98 at 19. This Court finds, and the Government later conceded at trial, that the capital requirements are not a major barrier to entry in the wholesale market. *See* Shapiro Tr. 6–11–98 at 88 ("raw capital" not a "big issue in terms of barriers").

The record provides little evidence of other likely barriers to timely entry, such as technology or expertise. There was no evidence

to suggest that the technology needed by new entrants to compete with the merging Defendants would be unavailable to them. In fact, evidence at trial seemed to suggest that competing wholesalers such as Bindley Western and Neuman Distributors have even more advanced technological systems than some of the Defendants. Although this Court acknowledges that the industry requires more technology than mere "picking-and-packing," it does not accept the notion that new entrants into the market must have the most expensive and advanced technological systems to compete with Defendants. With regard to the alleged expertise needed to operate a distribution center, this Court finds that the Defendants' plans to consolidate after the mergers would result in a large amount of experienced personnel searching for new employment opportunities. Expertise available for hire in the industry would be abundant. In analyzing whether there could be timely entry into the market after the mergers, this Court finds that new entry or expansion within the market could plausibly occur within a short enough period of time.

*Likeliness of Entry:* Another essential aspect in determining the ease of entry is the likelihood of its occurrence in response to anti-competitive practices. The Guidelines state that entry is to be considered "likely if it would be profitable at premerger prices, and if such prices could be secured by the entrant." Guidelines § 3 .3. The history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future. *See* Guidelines § 3.1; *Baker Hughes*, 908 F.2d at 988; *Waste Management*, 743 F.2d at 982; *United States v. United Tote*, 768 F.Supp. 1064, 1080–82 (D.Del.1991).

On its face, the history of entry and expansion in the pharmaceutical wholesale market does not suggest that any form of entry in the future is very likely. Only one new firm

---

**13.** The record is unclear as to the actual amount of capital required to enter this business. Based on the testimony, opening a new distribution center could cost anywhere from 2 million dollars to what Philip Piscopo of Neuman Distributors called a "rock bottom minimum" of 5 to 10 million dollars. *See* Pulido Tr. 6/22/98, at 102; Yost Tr. 6/29/98, at 61; WalterTr. 7/1/98, at 163; Barker Tr. 7/6/98, at 144; Burks Tr. 6/16/98, at 28; *cf.* Piscopo, Tr. 6/19/98, at 116. Furthermore, the record states that the necessary inventory could cost anywhere from 15 million to 50 million dollars per distribution center. *Compare* Burks Tr. 6/16/98, at 28; Walter Tr. 7/2/98, at 13.

has entered the industry since 1989—Beacon Distributors, a small wholesaler in Ohio founded by a former employee of McKesson. *See* Pulido Tr. 6/22/98, at 89–90. As for the expansion of existing competition, consolidation has been so prevalent in the industry in recent years that the number of firms has declined from 155 in 1977 to 45 today. *Cf. United States v. Hammermill Paper Co.*, 429 F.Supp. 1271, 1285 (W.D.Pa.1977) (using evidence showing an increase in the number of firms in the market to establish ease of entry). Profit margins have consistently decreased throughout the last decade, forcing out of business the less successful firms and forcing the more successful firms to continuously improve their cost-structures to maintain their profits. Given the highly competitive environment in the industry over the past two decades, the lack of entry in the past cannot necessarily be considered a reliable indicator of entry in the future should the competitive environment change. *See Baker Hughes*, 908 F.2d at 989 n. 9 ("failed entry in the past does not necessarily imply failed entry in the future: if prices reach supracompetitive levels, a company that has failed to enter in the past could become competitive.") (citations omitted).

The Defendants contend that the most likely new entrants into the pharmaceutical wholesale market are distributors in other related markets such as medical/surgical suppliers. The Defendants offered testimony at trial to suggest that Allegiance Healthcare and Owens & Minor, Inc., two of the largest distributors of medical/surgical supplies, are considering entering the market should collusive pricing practices occur after the Defendants' mergers. The Government countered by showing that both of these companies recently declined an offer from Kaiser Permanente, one of the nation's largest HMOs, to enter the market and supply it with 520 million dollars of pharmaceuticals annually. *See* Kramer Tr. 6/10/98, at 120–21; Kesman Tr. 6/25/98, at 102–03. In light of the evidence, this Court must question whether such companies are truly likely entrants in the wholesale market.

As for the likely expansion of the smaller "fringe" wholesalers, the Defendants cite to recent successful examples to show that further expansion is likely to occur in response any anti-competitive practices. Bindley Western, Walsh–Dohmen, and Morris & Dickson have all expanded their geographic reach in recent years. C.D. Smith just announced its intention to do the same. Furthermore, the Defendants point to AmeriSource as proof that expansion by a fringe firm is possible: In the past five years, AmeriSource achieved national status through an aggressive plan of expansion, opening five new distribution centers in five years. The Defendants contend that if they were to engage in anti-competitive practices after the mergers, the regional wholesalers already in the market would successfully respond through competition and expansion.

Despite the few examples of real success such as the sponsored entry of Walsh–Dohmen into a new regional market, this Court finds that the record is more uncertain than Defendants state. Although Bindley Western, Neuman, Morris & Dickson, and others have all expanded in recent years geographically and by market share, this growth has been insignificant on a national scale. The sheer economies of scale and strength of reputation that the Defendants already have over these wholesalers serve as barriers to competitors as they attempt to grow significantly in size. *See Rockford Memorial*, 898 F.2d at 1283–84 ("the fact [that fringe firms] are so small suggests that they would incur sharply rising costs in trying almost to double their output ... it is this prospect which keeps them small"); *United Tote*, 768 F.Supp. at 1078 (stating that the lack of a record demonstrating performance served as a significant barrier to ease of entry). Moreover, officers of Bindley Western and Neuman Distributors testified at trial that they have made no plans to expand in response to any post-merger pricing practices.

Based upon this evidence, the Court finds that the likelihood of new entry into the market by third-party distributors such as Allegiance Healthcare is theoretical at best. For the purposes of this case, the Court cannot engage in such speculation. However, for the fringe firms expanding into new markets, the Court finds that the evidence is

far more suggestive—after the mergers, distribution centers will be more readily available and competitive opportunities could well arise if the Defendants were to engage in anti-competitive behavior.

*Sufficiency of Entry:* According to the Guidelines, timely and likely entry must also "be sufficient to return market prices to their premerger levels." Guidelines § 3.0. Regardless of whether entry into the market is timely or likely, the FTC contends that any entry or expansion that occurs would be insufficient to mitigate the possible anti-competitive effects of the mergers. The Government contends that two national wholesalers would have to be created to sufficiently replace the competition removed from the market if the mergers were to be approved. Defendants respond that competitors need not be national in order to compete effectively and constrain anti-competition. Examples from the record abound to support Defendants' claim: Bindley Western, Neuman, Kinray, and Morris & Dickson have all successfully won business away from the Defendants. If the Defendants were to engage in anti-competitive practices after the mergers, these and other smaller wholesale distributors would certainly win more business away from the Defendants. However, this Court finds that the absence of another national wholesaler in the event of the mergers is too great a competitive loss—which the regional wholesalers cannot sufficiently replace. Evidence on the record demonstrates that most of the wholesalers' customers require two wholesale suppliers, one primary and the other secondary. Although the smaller wholesalers may adequately compete and expand to service both the primary and secondary needs of local customers, this Court finds that they would not sufficiently expand to compete with the nationals. After the mergers, only two national wholesale distributors would exist, leaving no choice for customers in certain regions (i.e. where no third competitor exists) to select a primary or secondary supplier other than the two proposed merged entities.

In analyzing the probabilities of entry or expansion in the future, it is critical to maintain a dynamic view of the relevant market.

The FTC in this case took a more static view of the market, emphasizing the past history of no new entry and little expansion by the fringe firms. As a result, the FTC overstated its case with regard to the lack of entry in the market. Clearly, expansion into new regional markets or initial entry into the market requires a fair amount of capital and "know-how," a positive reputation, and, most importantly, a considerable customer base. While these barriers to entry are significant, they could each be overcome in response to serious enough anti-competitive practices. That said, this Court finds that the likely and timely expansion or entry into the market by new or existing competitors would not be sufficient to offset any post-merger pricing practices that would result from the lack of competition. The record developed at trial is not strong enough for this Court to conclude that the Defendants' claim of entry and expansion is sufficient to rebut the Government's prima facie case.

(2) *Powerful Customers:* The Defendants further contend that the growth of the wholesalers' customers into large, powerful entities with the ability and incentive to frustrate any likely anti-competitive effects of the mergers is another factor to be considered by this Court in refuting the Government's case. "Well-established precedent and the ... Merger Guidelines recognize that the sophistication and bargaining power of buyers play a significant role in assessing the effects of a proposed transaction." *R.R. Donnelley & Sons Co.,* 1990–2 Trade Cas. (CCH) ¶ 69,-239 at 64,855 (D.D.C.1990). Although the courts have not yet found that power buyers alone enable a defendant to overcome the government's presumption of anti-competitiveness, courts have found that the existence of power buyers can be considered in their evaluation of an anti-trust case, along with such other factors as the ease of entry and likely efficiencies.

This Circuit has previously held that the existence of power buyers along with the ease of entry was sufficient to rebut a prima facie case of anti-competitiveness. *See United States v. Baker Hughes,* 908 F.2d 981 (D.C.Cir.1990). In *Baker Hughes,* the court cited the customers' ability to "closely exam-

ine available options and typically insist on receiving multiple, confidential bids for each order" as evidence of the leverage they held to combat any price increase that could result from the mergers. *Id.* at 986.

Similarly, a federal court in Iowa approved a merger in large part because the existence of large power buyers mitigated against the ability of the merging defendants to raise prices. *United States v. Archer–Daniels–Midland Co.*, 781 F.Supp. 1400, 1416 (S.D.Iowa 1991). In a market in which the 20 largest buyers accounted for more than 60% of total purchases, the court reasoned that the trend towards increased consolidation among customers enabled them to gain in strength and leverage, which they could utilize in negotiations. *Id.* at 1422.

In another case, a court refused to enjoin a merger where three large customers accounted for 90% of all purchases in the relevant product market. *United States v. Country Lake Foods, Inc.*, 754 F.Supp. 669 (D.Minn.1990). The court credited the customers' ability to monitor prices closely and aggressively challenge potential price increases by seeking alternative sources of supply outside the relevant geographic market. The court took this to be evidence of the true sophistication and power of the defendants' customers. *Id.* at 674. Central to the court's conclusion was the ability of the smaller buyers to unite and purchase through larger distributors or buying cooperatives. *Id.* at 679.

Other courts have stressed that the existence of power buyers does not necessarily mean that a merger will not result in anticompetitive effects. The court in *United States v. United Tote*, 768 F.Supp. 1064 (D.Del.1991), held that the existence of power buyers did not outweigh the potent ally damaging effects of a merger on numerous smaller customers. In *United Tote*, the relevant product market contained 255 customers, 39 of which were considered large. *Id.* at 1085. Although the larger buyers were not likely to suffer the effects of a lack of competition, the court concluded that the de-

fendants' smaller to mid-size customers without any significant bargaining power would be impermissibly harmed by the proposed mergers. *Id.* at 1085.

In the relevant product market at hand, wholesalers primarily service three classes of customers which must each be considered individually: (1) retail drug store chains; (2) institutional group purchasing organizations (GPOs); and (3) independent pharmacy buying groups. Retail chains and the biggest institutional GPOs are the wholesalers' largest customers, purchasing as much as 5 billion dollars annually. The rest of the institutional GPOs and the independent pharmacy buying groups are the wholesalers' smaller to mid-sized customers. Independent hospitals and pharmacies which do not belong to a larger purchasing organization are the Defendants' smallest customers. In the market today, very few of these customers still exist.

Although small in number, retail drug store chains are the wholesalers' largest customers with the most leverage of any in the industry. Chain customers generally self-warehouse approximately 70% of their pharmaceuticals today. Since wholesalers have been continuously losing business to self-warehousing retail chains in the past ten years, the threat of further self-distribution provides the chains with considerable leverage in contract negotiations. The retail chains' high-volume and long-term contracts—usually the largest and longest contracts that the wholesalers have—add to their enormous buying leverage. The existence of regional wholesalers to serve as an alternative to the Defendants and the possibility of sponsoring new companies to enter the market and service their contracts provide the retail chains with additional leveraging power.[14] *See Archer–Daniels–Midland Co.*, 781 F.Supp. at 1423; *see also Country Lake Foods*, 754 F.Supp. at 674 (Customers maintain buyer power because of their ability to seek suppliers outside the relevant geographic market and their "capability to vertically integrate should ... prices become

---

**14.** For example, evidence at trial showed that Bindley Western serviced Rite Aid in the past

and services CVS today.

noncompetitive and other sources not be available.").

Institutional GPOs also possess a considerable amount of leverage with the wholesalers. Although they often sign smaller contracts (Novation's 4.5 billion dollar contract is the exception) and do very little self-warehousing, institutional GPOs have numerous options available to them in the face of anticompetitive pricing practices by the Defendants. Evidence produced at trial suggests that these GPOs could further utilize the smaller regional wholesalers: Neuman Distributors and Morris & Dickson have already proven to be very successful in servicing hospitals; both Premier and MedEcon, two of the larger GPOs, use the regionals today. Sponsored entry of a smaller wholesaler or outside company into a new region of the market is also a viable alternative to the Defendants for institutional GPOs. Additionally, institutional GPOs, comprised primarily of hospitals, provide the wholesalers with a high volume of sales per distribution stop and the highest volume of sales annually. In 1997, institutional customers purchased nearly 25 billion dollars in pharmaceuticals from the wholesalers. They are the wholesalers' preferred customers.

The independent pharmacies and pharmacy buying groups are the least likely of any of the wholesalers' customers to be considered power buyers. Although the wholesalers receive their highest profit margins from the independent pharmacies, they account for only 15 billion dollars in purchases annually. Increasingly, the 27,000 independent pharmacies in the United States today are joining buying cooperatives which, in turn, are consolidating to try to develop greater buyer power. Like the retail chains and institutional customers, the independent pharmacies too have alternatives to the Defendants. They buy approximately 40% of their prescriptions from the smaller regional wholesalers. They have sponsored entry into new regional markets (United Drug previously sponsored AmeriSource's entry into Phoenix) and have explored entering into joint ventures with some of the smaller regional wholesalers to self-warehouse. For example, the Alabama Pharmacy Cooperative just re-cently completed a joint venture with Walsh and Dohmen to open distribution centers in the southeastern part of the United States.

Since independent pharmacies are always in danger of being sold to retail chains, the Defendants have the added incentive of keeping them in business—generating higher profit-margins for them as compared to the retail chains. Although this market dynamic provides the independent pharmacies with their greatest source of leverage, the term "power buyer" cannot really apply to them. In relation to the Defendants, the independent pharmacies have little leverage, as evidenced by the considerably higher upcharges they have to pay in comparison to the retail chains and institutional GPOs. *See United Tote*, 768 F.Supp. at 1085 (the merger in question "raise[d] the distinct possibility that the existing price differential could widen if . . . suppliers continued to provide low prices to their large customers but imposed unjustified price increases on the small to medium buyers.").

Based on the evidence presented at trial, this Court finds that the customers of the Defendants possess a significant amount of leverage in contract negotiations. On the whole, buyers monitor prices very closely and are aware of the wholesalers' individual cost-structures. Defendants could not easily engage in anti-competitive pricing practices after the mergers without incurring the wrath of its customers. Of course, with so many customers available and with negotiations constantly ongoing, the loss of any individual customer could be overcome relatively easily. Evidence presented at trial demonstrated that as soon as the Defendants lost one significant contract, they picked up another. Still, the Defendants' customers have increasingly consolidated in recent years through acquisitions and the formation of buying cooperatives. It has enabled them to use a variety of tactics in negotiating with the Defendants, "including playing off suppliers against one another, swinging volume back and forth among suppliers, disciplining sellers by cutting them off entirely, successfully insisting on year long or multi-year . . . agreements, and holding out the threat of inducing a new entrant into . . . production."

*Archer–Daniels–Midland,* 781 F.Supp. at 1422.

Nonetheless, this Court also finds that the existence of the independent pharmacies and the smaller hospitals makes the wholesale market considerably fragmented and remarkably similar to the market described in *United Tote, supra.* Given the large number of customers and the interchangeability of contracts, it is unclear just how important each individual customer, particularly each individual small to medium-sized customer, is to the Defendants. In the end, although this Court finds that buyer power does exist in whole market, primarily in the hands of the retail chains and the larger GPOs and is worthy of consideration, it alone cannot rebut the Government's prima facie case.

(3) *Efficiencies:* Finally, the Defendants contend that the efficiencies resulting from the mergers are substantial enough to rebut the Government's case. Efficiencies are cost savings generated by the increased economies of scale which result from mergers. While the FTC contends that "[c]ompetition usually spurs firms to achieve efficiencies internally," it concedes that mergers nonetheless "have the potential to generate significant efficiencies by permitting a better utilization of existing assets, enabling the combined firm to achieve lower costs in producing a given quality and quantity than either firm could have achieved without the proposed transaction." Guidelines § 4. In support of the mergers, the Defendants contend that they will result in tremendous cost savings. They represent that at least half of the efficiencies to be gained from the mergers will be passed through to the consumer in the form of lower prices and improved services.

 First and foremost, it remains an unsettled question of law whether the Court can even consider the claimed efficiencies as a factor in adjudication. A review of the relevant case law concerning efficiencies reveals a mixed and indeterminate record. *See, e.g., FTC v. Staples,* 970 F.Supp. 1066, 1088 (D.D.C.1997) (holding that the extent to

which a defendant may use efficiencies to rebut the government's case is "not entirely clear.").

Several older Supreme Court cases rejected the consideration of efficiencies. For example, the Court held in *FTC v. Procter & Gamble,* 386 U.S. 568 580, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) that "[p]ossible economies cannot be used as a defense to illegality [in Section 7 merger cases]." The Court explicitly stated that merely weighing the anticompetitive effects with the claimed efficiencies was not appropriate: "Congress was aware [when it enacted Section 7] that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition." *Id.* (citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 344, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). According to the Supreme Court, a merger that may substantially lessen competition is not saved because "on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial." *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 371, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

Yet while the Supreme Court has traditionally frowned on the use of efficiencies to rebut a prima facie case, more recent Circuit Court law has departed from the historic rule. In *FTC v. University Health, Inc.,* 938 F.2d 1206, 1222 (11th Cir.1991), the Circuit Court held that "a defendant may rebut the government's prima facie case with evidence showing that the merger would create significant efficiencies in the relevant market." Likewise, our own district court in *FTC v. Staples, Inc.,* 970 F.Supp. 1066, 1090 (1997), considered the defendants' claimed efficiencies in its analysis of the case, even though it ultimately found them to have been overstated.[15] *But see FTC v. Coca–Cola Co.,* 641 F.Supp. 1128, 1141 (D.D.C.1986), *vacated as moot,* 829 F.2d 191 (D.C.Cir.1987) (efficiencies, insofar as they benefit customers, were to be "developed by dominant concerns using their brains, not their money in buying out troubling competitors.").

---

**15.** Although our own Court of Appeals has not yet spoken directly on the issue, it assumed the validity of the efficiencies defense raised in *Unit-* *ed States v. Baker Hughes Inc.,* 908 F.2d 981, 992 (D.C.Cir.1990).

The FTC itself has moved away from the old Supreme Court cases and recognized that efficiencies may well be a factor to be considered. In its most recent edition of the Merger Guidelines, the FTC set forth the standards by which a defendant's claim of efficiencies could be considered: if the alleged efficiencies were (1) verifiable and (2) "merger-specific." *See* Guidelines § 4. While "efficiencies are difficult to verify and quantify," the Guidelines contend that the cost savings projected by the defendants must be done reasonably and in good faith. *See* Guidelines § 4. Efficiency claims that are merely speculative or vague or otherwise unsound should not be considered by the Court. The Guidelines also contend that the efficiencies must be "merger specific," in other words "likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anti-competitive effects." Guidelines § 4. In light of the anti-competitive concerns that mergers raise, efficiencies, no matter how great, should not be considered if they could also be accomplished without a merger.

In this case, the Defendants contend that one of the primary factors motivating the proposed mergers is the anticipated efficiencies. Defendants have represented to the public and to this Court that they will pass through at least half of the projected cost savings to consumers. Cardinal presented to its Board in August 1997 that its proposed merger with Bergen would result in cost savings and other efficiencies of at least 220 million dollars in the next three years, or roughly 72 million dollars per year. *See* DXC 165A; DXC 426. Cardinal itemized the 220 million dollar total as follows: consolidation of the two companies' distribution centers would account for 71 million dollars of savings; increased buying margin approximately 78 million dollars; and the remaining 71 million dollars or so from reductions in corporate overhead and interest savings from the corresponding reduction in inventory following the merger.

In a subsequent due diligence study, Cardinal refined the estimated figures and concluded that the total cost savings from the merger would likely exceed 307 million dollars. The revised numbers estimated that distribution center consolidation would account for approximately 82 million dollars in savings; the elimination of corporate overhead 63 million dollars; better purchasing practices an additional 83 million dollars; and increased volume buying power approximately 67 million dollars. *See* Ford Tr. 7–6–98 at 160–67; DXC 166.

Similarly, Mark Pulido, CEO of McKesson, testified that his company would save approximately 146 million dollars a year if it were to merge with AmeriSource: 88 million dollars or so from the consolidation of the two companies' distribution centers; another 26 million dollars from improved purchasing practices; 18 million dollars from the elimination of corporate overhead; and 12 million dollars from the integration of the companies' information technology and the elimination of redundant functions. *See* Pulido Tr. 6–22–98 at 112; DXM 632.

In response to the Defendants' claims, the FTC does not contest that the mergers will result in large-scale efficiencies, some of which will be passed on to the consumer. The government contends, however, that (1) the extent of the claimed efficiencies is inflated, (2) the percentage of savings passed on to consumers may decrease from present levels, and (3) that many of the claimed efficiencies are not specific to the mergers—they could also be achieved through continued competition. Dr. Lutz, the government's economic efficiencies expert, testified that Cardinal would likely save between 38 and 52 million dollars a year rather than the company's claimed 72 million dollars. Likewise, she found that McKesson's annual savings would be closer to 116 million dollars a year as compared to the Defendant's projected 146 million dollars. Similarly, the FTC noted at trial that wholesalers have previously passed on 80% of their cost savings to consumers; the pledge of a 50% pass rate would be a substantial reduction from the present rate of savings enjoyed by the Defendants' customers. Most importantly, the FTC presented substantial evidence at trial to suggest that the efficiencies claimed by the Defen

dants are not merger-specific. Dr. Lutz pointed to several potential distribution center consolidations which could be achieved even without the mergers; she testified that the Defendants could also attain savings from improved purchasing practices and inventory reductions on their own by adopting better business strategies. She also stated that the substantial savings through larger volume purchasing was unlikely since the four Defendants already purchase pharmaceuticals at the highest volume discount available. Because much of the claimed savings could be achieved without the proposed mergers, the FTC asserts that they should not be considered by this Court.

Weighing the evidence before it, this Court finds that the Defendants have sufficiently proved that significant efficiencies would likely result from the proposed mergers. Even though the government's own expert contests the exact amount likely to be saved, she conceded at trial that the merger would result in substantial savings. Indeed, the Defendants clearly would not have chosen to merge in the absence of tremendous savings. However, this Court finds that evidence presented by the FTC strongly suggests that much of the savings anticipated from the mergers could also be achieved through continued competition in the wholesale industry. While it must be conceded that the mergers would likely yield the cost savings more immediately, the history of the industry over the past ten years demonstrates the power of competition to lower cost structures and garner efficiencies as well. The critical question raised by the efficiencies defense is whether the projected savings from the mergers are enough to overcome the evidence that tends to show that possibly greater benefits can be achieved by the public through existing, continued competition. The Defendants simply have not made their case on this point.

### c. Ultimate Burden of Persuasion

 Despite the shifting burdens of production in an anti-trust case, the ultimate burden of persuasion always rests with the Government. *See United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 613, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). While the Defendants presented credible evidence in this case to rebut the FTC's presumption of anti-competitiveness, this Court ultimately finds on the record that the Government's case is more persuasive. In particular, this Court finds that the Government at trial presented three compelling examples of the way in which significant anti-competitive effects would likely occur if the mergers were to be approved. (1) The FTC at trial showed, through Defendants' own internal documents and public statements, that they perceived that the excess capacity currently in the marketplace was the primary factor fueling so-called "irrational" pricing. (2) With data supplied by the Defendants, the Government showed that continued competition in the industry after the FTC rejected a previous attempt by McKesson to acquire AmeriSource in 1988 led to a significant reduction in prices benefitting the American customer. (3) Lastly, the FTC presented evidence to suggest that Defendants, even without the mergers, have the ability to engage in collusive pricing practices. In light of this evidence, the Court finds that the Government has clearly shown the likelihood of success on the merits and met its burden under the law.

(1) *Mergers as an Effort to Achieve "Rational" Pricing:* It was undisputed at trial that after the mergers, the Defendants intend to consolidate most of their distribution centers, closing more than 40 of their centers and thus removing considerable "excess capacity" from the market. *See, e.g.,* Ford Tr. 7/6/98, at 165; DXM 783. Defendants represented at trial that the motivation behind the consolidation was to reduce costs and achieve efficiencies, which ultimately would be to the benefit of the American consumer. However, the FTC presented evidence to suggest that the driving force behind removing excess capacity in the market was to ease pricing pressures and return prices to "rational" levels. At trial, the Government produced internal documents from each of the Defendants discussing the existence of excess capacity in the market and its adverse effects on Defendants' sell margins. In an internal document provided by McKesson entitled "Strategic Overview Summary," the company stated that "overcapacity = price pressures."

PX 186 at 5856; *see also* PX 162 at 2134–35 (stating that pricing pressures were driving down margins and hoping that prices would "stabilize" in the future); PX 186 at 5897 ("overcapacity in the marketplace = stiff competition"). An internal document representing AmeriSource's official position on the announced Cardinal/Bergen merger stated that it was "very positive" for the industry. The document concluded that "[c]onsolidation at the top tier of the industry suggests that there will be a *more orderly market* overall . . . . it suggests that with only three dominant players there will be *rational pricing* even while competitive market share challenges will continue." PX 134 at 1756 (emphasis added).

In addition to these documents, the Government established at trial that senior representatives from the Defendant companies also took the same view toward excess capacity and pricing pressures in the market. Robert Walter, the CEO of Cardinal, admitted that he wrote notes to himself stating that "pricing is not rational." PX 172 at 1051. His notes went on to describe the market as driven by "insane pricing." *Id.* at 1054. On the same page, he wrote "There is too much capacity now and more coming on line [without] prospects for reduction . . . to expect pricing to ease." *Id.* The record reflects that Mark Pulido, the CEO of McKesson, had similar thoughts on the market. Minutes from a meeting of the Board of Directors at McKesson describe Mr. Pulido as having "remarked that the proposed [Cardinal/Bergen] merger will be positive for industry conditions in that excess capacity will be removed." PX 178 at 0002; DXM 32.

Witnesses representing the wholesalers' customers and competitors confirmed at trial that excess capacity in the industry has continued to drive down prices. *See, e.g.,* Dooley Tr. 6/24/98, at 112; Sorkin Tr. 6/17/98, at 91; Slusser Tr. 6/25/98, at 151. This Court finds that excess capacity in the market has clearly been to the benefit of the American consumer. For example, Larry Dooley of VHA, a large hospital buying group, testified that it is excess capacity that has allowed VHA to negotiate better prices for its members. *See* Dooley Tr. 6/24/98, at 112. If the

mergers were to be approved and excess capacity removed from the market, this Court finds that pricing pressure would ease and prices would not likely continue to go down. In the end, this would inevitably affect competition to the detriment of the American consumer. A C.D. Smith document presented at trial illustrates this point: It states that the increase in sell margins that the industry experienced in 1996 "was caused primarily by improved industry conditions related to the restoration of rational pricing following the acquisition of FoxMeyer by McKesson." PX 574 at 0010. The Court can only conclude from this evidence before it that the intended consolidations after the mergers would likely curb downward pricing pressures and adversely affect competition in the market.

(2) *Competition in the Market Following McKesson's Failed Attempt to Acquire AmeriSource in 1988:* In support of the mergers, Defendants have consistently represented that they would not raise prices if allowed to merge. Given its representation that prices will not rise after the mergers, Defendants contend that these transactions would only create efficiencies, not anti-competitive effects. This Court does not doubt that the Defendants would honor their promises. Nonetheless, it is persuaded by the Government's evidence that even with such guarantees, the mergers would likely result in anti-competitive prices. At trial, the parties conceded that McKesson had previously tried to acquire AmeriSource, then known as Alco, back in 1988. After the FTC announced its intention to challenge the merger, McKesson and AmeriSource withdrew their plans. The Government presented evidence at trial to show what would have happened to competition in the market had the FTC allowed the 1988 merger to go through. *See* PX 164. Ten years ago, the average upcharge was slightly over 400 basis points. Back in 1988, if the Defendants had the made same representations as they make today—promising not to raise their prices after the merger—competition and pricing in the market could have been expected to remain about the same. Yet because the FTC chose to block the merger in 1988, the industry experienced nearly ten more years of competition. As a

result of that choice, Defendants' customers today pay an upcharge of only 35 basis points, as compared to the 400 basis points of 1988.[16] Clearly, the market at work achieved its intended effect: increased competition and lowered prices. In light of this historical data, Defendants' guarantees alone cannot cure the likely anti-competitive effects of the mergers. Over the past ten years, fierce competition among the four Defendants has led to falling prices. The Defendants' promise not to raise prices fails to ensure that prices will continue to fall after these mergers—or fall by the amount they would have absent the mergers. This Court is not convinced that the Defendants would still vigorously compete with one another after the mergers to continue lowering their prices. In the absence of real competition, it is concerned that the prices set today could in effect become the floor tomorrow. PX 164 at 0893. Given the evidence presented, this Court finds that it must proceed cautiously and preserve competition pending a full administrative review.

(3) *Evidence of Pricing Coordination by Defendants:* Lastly, the Government presented evidence at trial to suggest that the Defendants even today engage in some form of an anti-competitive pricing practices. In 1994–95, VHA, one of the largest hospital GPOs, negotiated contracts with three of the four Defendants—Cardinal, Bergen, and AmeriSource. *See* Korte Tr. 6/24/98, at 4–5. The contracts contained certain provisions that not only guaranteed VHA members a favorable price, but also set a floor on the price that the Defendants would offer to other hospitals and GPOs. First and foremost, the contracts established a common pricing matrix that was to be honored by the Defendants, guaranteeing that VHA members would receive the same price from each of the three wholesalers. The contracts also included a so-called "most favored customer" clause which operated in a way unlike other such clauses. Instead of guaranteeing VHA members the lowest price offered to any of the Defendants' customers, in practice the clause functioned to guarantee that no other customer would be charged a price lower

than the VHA. In other words, the agreement served to police the Defendants from trying to undercut one another in the competitive marketplace. *See* Korte Tr. 6/23/98; Dooley Tr. 6/24/98; *see also* PX 373 at 0215; PX 383 at 0634.

According to the testimony and evidence offered at trial, from around 1995–96, Bergen and Cardinal complained to VHA when they believed that AmeriSource was offering lower prices to competing GPOs. *See, e.g.,* PX 373 at 0215 (Bergen official complaining to VHA about an AmeriSource offer in a letter stating that "we appreciate your effort in helping address our industry's mounting margin pressure."); PX 929 (Cardinal official complaining to VHA about an AmeriSource offer that was below the pricing matrix); *see also* PX 379 at 0753; PX 386 at 2180–82. In each instance, VHA acted on the complaints by contacting AmeriSource to bring its prices back to the agreed upon matrix. *See, e.g.,* PX 930–36. Similarly, when Cardinal violated the agreement and offered lower prices, Bergen complained. *See* PX 939–46; Korte Tr. 6/24/98, at 27–65. In this way, even without the mergers, three of the four Defendants engaged in a subtle form of price stabilization. It is obvious that these kinds of actions are inimical to the competitive market system and must cease. In fairness, it is important to note that McKesson was not involved at all in these transactions. In addition, there was no evidence at trial that would indicate that the CEOs of Cardinal, Bergen, or AmeriSource were in any way directly involved in these activities. Indeed, Donald Roden, the CEO of Bergen, is a new executive who assumed his position in January 1997, many months after the date of the activities in question occurred.

In light of the evidence, the FTC contends that after the mergers, the Defendants would have an even greater ability to tacitly set prices and become non-competitive. Although the Court is not convinced from the record that the Defendants actually engaged in wrongdoing, it is persuaded that in the event of a merger, the Defendants would likely have an increased ability to coordinate their pricing practices. Thus, the Govern-

---

**16.** A basis point equals one-one hundredth of a percent.

ment has met its burden of proof; it has shown a likelihood of success on the merits in a full administrative review.

## B. THE EQUITIES

 Where the Court has found that the Government has established the likelihood of success on the merits, a presumption arises in favor of granting the preliminary injunction. *See, e.g., FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1507 (D.C.Cir.1986). Despite the presumption, however, the Court must still weigh both the public and private equities in the case in determining the final outcome. *See FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1082 (D.C.Cir.1981). Because the decision either to grant or deny preliminary injunction must necessarily be made under time constraints, it is permissible for the court to weigh the public and private benefits that may be gained and lost by a merger whether or not such benefits could be established in a proceeding for permanent relief. *See id.* at 1083. In balancing the public and private equities, benefits to the public are entitled to substantially more deference than the benefits to the private Defendants. *See id.* Once the FTC has established likelihood of success on the merits, the Defendants' showing of private equities alone is insufficient to deny the preliminary injunction. *See id.* Where the merger is supported by public equities, however, a court may still exercise its independent judgment notwithstanding that the FTC has established the likelihood of success on the merits. *See, e.g. FTC v. Staples*, 970 F.Supp. 1066, 1092 (D.D.C.1997).

 In this case, Defendants are not claiming any private equities in support of the mergers. Rather, they claim that public equities—the efficiencies to be gained from the mergers—support a denial of the injunction. Defendants contend that the benefits to customers, in the form of improved services and cost savings outweigh any of the potential anti-competitive effects of the mergers. In response, the FTC contends that consumers would lose from the mergers the successively lower prices and greater innovation that they witnessed under competition. The Court has already addressed the

Defendants' claim of efficiencies in Part II, Section A.3. b. (3). In the end, the Defendants have not been able to establish that the equities weigh so much in their favor to deny the FTC the relief its seeks.

## III. CONCLUSION

The trial of this case over the past seven weeks has been a fascinating experience. It has been more than the trial of a protracted case. An important phase of the pharmaceutical industry has been laid bare. We learned that of every dollar spent on prescription drugs, 76 cents goes to the manufacturer, 20 cents to the dispenser, and only 4 cents to the wholesaler, the four largest of which are the Defendants in the present lawsuit. Although the wholesalers are important in the distribution of prescription drugs to the citizens of this nation, their take of the profit is extremely small.

Up until the present action of the FTC, the wholesale sector of the industry was an excellent example of how effectively the nation's market system works. The four Defendants conduct their business on a national basis. Although the wholesaler has been a part of the industry for over 150 years, most of this part of the business has been done regionally. Indeed, up until only six years ago, the only wholesaler with a nationwide presence was McKesson. Cardinal, Bergen, and AmeriSource all developed from regional to national firms during the past six years. This expansion was largely accomplished through the acquisition of regional wholesalers. In effect, expansion came about through consolidation. The emergence of Defendants' nationwide presence occurred at almost the same time the number of regional wholesalers was being reduced from 81 in 1992 to 54 in 1997.

The current proposed mergers would further reduce the number of national wholesalers from four to two, giving them control of over 80% of the wholesale market. This tremendous concentration of business is the key obstacle that Defendants have been unable to overcome in this case.

While the Defendants have presented a formidable defense attempting to rationalize

these latest proposed consolidations, they simply have been unable to overcome the FTC's charge that going from four to two national firms would reduce the competitive balance beyond that which is legally permissible. Defendants have made persuasive arguments that the market at issue is much broader than the 54 billion dollar wholesale market. They argue that the relevant market should include pharmaceutical products directly sold by the manufacturer and self-warehoused by the large drug store chains and others. Their argument fails because while self-warehousing acts as a buffer to price increases by those who self-warehouse, not all distributors self-warehouse, making them vulnerable to price increases.

As previously noted, there are other charges made by the FTC that Defendants have been unable to overcome. Of particular concern is the lack of competition that the proposed mergers would present to certain specific regions of this nation. For example, in the northwest region of the country, if the proposed mergers were approved, the two surviving entities would control virtually 100% of the market. Since the record reflects that a good number of dispensers require a backup wholesaler to step in when the primary wholesaler is unable to meet their needs, there would be few if any price restraining forces in the market areas where only two competitors exist.

In most instances, this nation's market system, the best in the world, is able to discipline itself. It is for this reason that the Court explored every opportunity with the parties to find a way to permit the proposed mergers to go forward.[17] The Defendants, who perform a valuable public service, were willing to allay any concerns of price gauging by representing they would not raise the charge for their services and would share with their customers at least 50% of the cost savings obtained from their consolidation efforts. While such undertakings would go a long way toward addressing the public's legitimate concerns, the mere fact that such representations had to be made strongly supports the fears of impermissible monopolization.

In this regard, Plaintiff's Exhibit No. 164 was particularly telling. When read in conjunction with Cardinal's Exhibit No. 431, the data from the two charts showed that if the industry had made a promise not to raise prices in 1988 when McKesson first tried to acquire AmeriSource and froze prices at that time, the public would have been deprived of a reduction in the wholesale "upcharge" of some 350 plus basis points.

Although the Defendants' assurances to date might not be adequate, there are enough potential public benefits from the proposed mergers that would dictate a further effort by the parties to permit the mergers to go forward. This would be particularly so if Defendants are correct that considerable cost savings would be forthcoming from the proposed mergers with a good part of those savings being passed through to the dispenser and ultimately to the consuming public.

The Walsh Dohmen "Investiture" experiment would seem to be one fruitful area for exploration.[18] This would entail the Defen-

---

17. The Court went so far as to appoint one of this nation's preeminent attorneys, Milton Gould, who agreed to serve as special master on a pro-bono basis. With the able assistance of Steven Levitsky and Molly Boast of the law firm of LeBoeuf Lamb, Mr. Gould attempted to negotiate a settlement. Mr. Gould, Mr. Levitsky, and Ms. Boast spent considerable effort in trying to resolve the differences between the Government and the Defendants. Even though they were ultimately unsuccessful, the Court expresses its appreciation for Mr. Gould, Mr. Levitsky, and Ms. Boast's pro-bono services.

18. Walsh–Dohmen is a joint-venture company made up of APCI, a pharmaceutical retail buying group representing independent pharmacies, and two regional drug wholesalers Walsh and Dohmen. The three equity partners entered into the venture when the local regional wholesaler, Walker Drug, was acquired by AmeriSource in 1997. Rather than transfer its business to a national wholesaler, APCI solicited proposals from several independent wholesalers to open a pharmaceutical warehouse in Birmingham, Alabama to service the needs of its members. APCI ultimately selected the joint venture proposal submitted by Walsh Distribution, a wholesaler located in Texas, and the F. Dohmen Company, a wholesaler located in Wisconsin. APCI's members formed the initial customer base of the Walsh–Dohmen Southeast Venture, which opened in early 1998. Testimony on the record reflects that this new company combines the

dants' underwriting some ten or so regional wholesalers in areas where adequate competition would not exist after the merger. Since the proposed mergers contemplate the closing of nearly 50 warehouses and with inventories being created on a consignment basis, the cost to Defendants would be almost inconsequential. These are obviously only suggestions and not dictates. The ball is exclusively in the parties' court.

The Court congratulates all counsel for an extremely well tried case. While eminent lead counsel were at all times in charge of litigation decisions and trial strategy, the Court commends counsel for sharing certain of the litigation chores with other capable lawyers from their offices. Their performance was excellent. The advocacy of all counsel was simply superb. What was particularly pleasing to the Court was the tremendous civility among counsel that prevailed at all times.

While the Court has praise for all counsel in this case, it wants to note in particular the high level of performance by the FTC. It was not too long ago when this agency was so fraught with dissension that it was unable to perform its mission. Indeed, there were times when instead of acting, it chose to walk away. In important areas of anti-trust law, the agency's decision was a stale-mate. Seeing the fine performance of this agency over the past seven weeks indicates that the agency is blessed with a fine staff and outstanding leadership from the top. If this case is an example of the revitalized agency in action, the public interest will be well served in the days to come. An appropriate Order granting Plaintiff the relief it seeks accompanies this Opinion.

### ORDER

This matter comes before the Court on the Federal Trade Commission's ("FTC") motion for a preliminary injunction.

Upon consideration of the Plaintiff's pleadings, memoranda, declarations, and other exhibits filed in support of said motion, and of the papers filed in opposition thereto, and following a trial lasting from June 10 to July 24, 1998, the Court finds as follows:

(1) In the absence of preliminary relief, Defendant McKesson will be able to consummate its acquisition of AmericSource;

(2) In the absence of preliminary relief, Defendant Cardinal will be able to consummate its acquisition of Bergen;

(3) If relief is not granted, Plaintiff and the public interest will be irreparably injured because the FTC will be deprived of its ability to order effective relief should the acquisition ultimately be found to violate the antitrust laws or the FTC Act; and

(4) Plaintiff has made a sufficient showing of a likelihood of success on the merits of its complaint to warrant the relief afforded by this Order;

**NOW THERETOFORE IT IS ORDERED** that Plaintiff's motion for a preliminary injunction be, and hereby is, **GRANTED** in its entirety; and

**IT IS FURTHER ORDERED** that Defendant McKesson and any parent, affiliate, subsidiary, or division thereof are hereby enjoined and restrained, pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), from acquiring any stock, assets, or other interest, directly or indirectly, in Defendant AmeriSource; and

**IT IS FURTHER ORDERED** that Defendant Cardinal and any parent, affiliate, subsidiary, or division thereof are hereby enjoined and restrained, pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), from acquiring any stock, assets, or other interest, directly or indirectly, in Defendant Bergen; and

expertise of the two regional wholesalers, the customer base of a regional buying group, and the financial backing of all three of the firms. Essentially, Walsh–Dohmen demonstrates that local customers can sponsor the entry of regional wholesalers into a new region with relative ease and limited capital expenditure. What this Court

means when it refers to the "Walsh–Dohmen Investiture Experiment" is a way in which Defendants could provide the seed capital for others to recreate entry into regional markets that would be in a competitive imbalance after the mergers.

**IT IS FURTHER ORDERED** that Defendants take any and all necessary steps to prevent any of their domestic or foreign agents, divisions, subsidiaries, affiliates, partnerships, and joint ventures from completing such acquisitions, and from taking any steps or actions in furtherance thereof; and

**IT IS FURTHER ORDERED** that Defendants return all confidential information received directly or indirectly from one another and destroy all notes relating to such information; and

**IT IS FURTHER ORDERED** that Defendants maintain the status quo pending the issuance of an administrative complaint by the FTC and until such complaint is dismissed by the FTC or set aside on review or until the order of the FTC made therein has become final.